Ellen S. DRIGGIN, et al., Plaintiffs

v.

AMERICAN SECURITY ALARM
CO., et al., Defendants

No. CIV 99–368–P–H.

United States District Court,
D. Maine.

Oct. 27, 2000.

Leonard M. Gulino, Michael A. Cunniff, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, for Plaintiffs.

Frederick C. Moore, Thomas R. Kelly, Robinson, Kriger, Mccallum & Greene, P.A., Martha C. Gaythwaite, Melinda P. Shain, Portland, ME, for Defendants.

## ORDER ON DEFENDANT PETER GOODALE'S MOTION FOR SUMMARY JUDGMENT

HORNBY, Chief Judge.

This case arises out of a fire that occurred at a restaurant in 1998. The owner of the restaurant property and her husband have asserted that an electrician improperly installed electrical equipment at the property in 1996, causing the fire. They seek to recover uninsured losses, including business interruption loss, lost opportunity costs, unreimbursed renovation costs, and legal fees.

The defendant electrician, Peter Goodale, has moved for summary judgment. I conclude that the husband, Seth Driggin, does not have standing; that the plaintiff Ellen Driggin cannot recover business interruption losses arising out of her decision to terminate the lease in place at the time of the fire; that she can proceed on her request for business interruption losses arising out of her other leasing decisions; that her later transfer of the property to Staco Realty, a Maine limited liability company she wholly owns, does not impair her recovery; and that alleged spoliation of evidence does not justify a sanction of judgment for Goodale or exclusion of the plaintiffs' expert. Therefore, Goodale's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

## I. FACTS

A fire occurred at 125 Shore Road, Ogunquit, Maine, on April 17, 1998. Def.'s Statement of Material Facts Not In Dispute (DSMF) ¶ 1. The plaintiff Ellen S. Driggin was the sole owner of the property at the time of the fire. DSMF ¶ 2. Mrs. Driggin's husband, Seth Driggin, had operated a seasonal restaurant—The Compass Rose—at the property from 1994 until 1997 through a corporation of the same name. DSMF ¶ 3. Peter Goodale is an electrician who performed electrical work at the property in 1996. Pls.' Statement of Additional Material Facts (PSAMF) ¶ 2. That work included installing an electrical junction box. PSAMF ¶ 5. The plaintiffs allege that Goodale applied an improper level of torque when tightening a split bolt connector in the junction box, and that this caused electrical arcing that ignited the fire. PSAMF ¶¶ 6–10, 13.

Richard Shepard, a Senior Investigator employed by the Maine State Fire Marshal's Office, inspected the property on the date of the fire. DSMF ¶ 28. Shepard was accompanied during his inspection by Kurt Knight, an electrician and firefighter, who was present in his capacity as a firefighter for the Town of Ogunquit. PSAMF ¶ 23. Shepard concluded that the fire originated in the "basement crawl space." DSMF ¶ 28. The exact location that he was referring to in using those words is disputed, as discussed in Part II(D), *infra*.

On April 21, 1998, the day that the State Fire Marshal's Office released the property for inspection by private investigators, Nathaniel Johnson, a fire investigator retained by the plaintiffs' insurer, Peerless Insurance Company ("Peerless Insurance"), inspected the property. DSMF ¶ 21; PSAMF ¶¶ 39, 41.[1] The plaintiffs'

---

1. Peerless Insurance insured both the plaintiffs and Goodale. The plaintiffs mention this and assert that "[t]o the extent decisions were made by Peerless about the timing and method of demolition, those decisions were made by Goodale's agent and insurer, Peerless In-

claims are based largely on Johnson's report: In it, he concluded that an improper level of torque had been applied to a split bolt connector in a junction box, causing electrical arcing that ignited the fire. Johnson has acknowledged that it was his responsibility to preserve the scene and the physical evidence so that if litigation ensued prospective defendants could conduct independent inspections of the property. DSMF ¶¶ 22–23.

Goodale was sent a notice of claim on April 22, 1998, PSAMF ¶ 25, evidently by an attorney retained by Seth Driggin (although this is not entirely clear). *See* Goodale Dep. 119:18–121:18. A "a week or two" after he received the notice of claim, on approximately May 6, 1998, Goodale and the expert that Peerless Insurance retained for him, electrical engineer Ronald Goulet, inspected the premises. PSAMF ¶¶ 25, 27. Goodale claims that the scene had been too disturbed for Goulet to complete an effective inspection. The extent of the disturbance is not clear from the record; its impact on Goulet's ability to complete his inspection is disputed. Goulet's affidavit states that his inspection was not as comprehensive as usual because, in his opinion, the fire scene had been disturbed in a manner that prevented him from being able to determine the cause or origin of the fire. Goulet Aff. ¶¶ 4–8. Goodale does not dispute, however, that the junction box containing the split bolt alleged to have started the fire, two circuit breaker panels and their covers, and the fire alarm panel were all still

in place at the time of the inspection. PSAMF ¶ 33. Furthermore, "structural members, the wiring, or other potential heat sources such as the furnace and heating system were not destroyed or materially altered," PSAMF ¶ 27, and Goulet did observe the molten remains of the split bolt that allegedly caused the fire. PSAMF ¶ 34. It seems, however, that some of the charred floorboards were no longer in place (the parties do not address this in their statements of fact, but it does not appear to be disputed). *See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 17; Pls.' Opp'n at 10 (admitting that some of the floorboards had been removed by construction workers prior to Goulet's visit). It is not clear whether the floorboards remained someplace at the property or had been disposed of entirely. In any case, Goodale does not dispute the plaintiffs' assertion that neither of them was involved in decisions regarding the timing or scope of the demolition after the fire.[2] PSAMF ¶ 40; Def.'s Response to PSAMF ¶ 40. While it is Goulet's standard practice to take notes, photos, and sketches during an inspection, PSAMF ¶ 28, he cannot locate any notes, photos, or sketches that he might have taken in this case. PSAMF ¶ 29.

At some point—exactly when is not clear from the record—Johnson instructed a contractor to cut out of the basement and to store on the first floor of the property the junction box containing the split bolt and its plywood backing, two electrical

---

surance." Pls.' Opp'n to Def.'s Mot. for Summ. J. at 14. The plaintiffs carry that assertion no further, however, and I will not construct an argument for them.

2. Goodale does note, however that Seth Driggin was involved in construction supervision, and that Ellen Driggin paid him over $25,730 for his efforts. Def.'s Resp. to PSAMF ¶ 40. Apparently, Goodale distinguishes between

demolition and construction: he admits that Mr. Driggin was not involved in the demolition, but asserts that he did supervise the construction. *Id.* It is my understanding that the contractor's relevant activities at the property prior to Goulet's inspection were part of the demolition, that is, activities that Mr. Driggin was not involved in. Virball Aff. ¶¶ 4-5.

panels, and a fire alarm panel. DSMF ¶ 23; Pls.' Resp. to DSMF ¶ 23. On June 1, 1998, Johnson returned to the property to retrieve those items. DSMF ¶ 24; Pls.' Resp. to DSMF ¶ 24. Evidently—though again, it is not entirely clear from the record—the fire alarm panel was no longer there. Johnson did retrieve the junction box and the electrical panels. DSMF ¶ 24; Pls.' Resp. to DSMF ¶ 24. He later discovered, however, that he did not have the split bolt itself.[3] DSMF ¶ 25; Pls.' Resp. to DSMF ¶ 25. Johnson does not know the present whereabouts of the split bolt. DSMF ¶ 25.

Prior to the fire, in early 1998, Ellen Driggin had leased the property to Arthur Pappas, who planned on operating The Compass Rose himself. DSMF ¶ 5. Also prior to the fire, Pappas had defaulted on certain lease obligations. DSMF ¶ 11; Seth Driggin Dep. II at 75–77. The Pappas lease was in effect on the date of the fire. DSMF ¶ 5. After the fire, during the time that the restaurant was closed, Mrs. Driggin terminated the lease with Pappas. Pls.' Resp. to DSMF ¶ 10. She asserts that the fire exacerbated Pappas's difficulties in making lease payments. Pls.' Resp. to DSMF ¶ 11. Three months after the fire, Seth Driggin reopened the restaurant and operated it for the remainder of the 1998 tourist season. DSMF ¶ 9.

On January 6, 1999, Ellen Driggin transferred her ownership interest in the property to Staco Realty, a Maine limited liability company she wholly owns. DSMF ¶ 16; PSAMF ¶ 20. She "did not assign her cause of action against [Goodale] to Staco Realty," PSAMF ¶ 21, and received no consideration for the transfer other than a 100 percent ownership interest in Staco Realty. PSAMF ¶ 20. On January

8, 1999, two days after the transfer, Staco Realty leased the property to Poor Richard's Tavern, Inc., operated by restaurateur Richard Perkins. DSMF ¶ 17.

Ellen Driggin's insurer, Peerless Insurance Company, reimbursed her for property damage and certain lost rents. DSMF ¶ 1. This lawsuit is not a subrogation action, and Mrs. Driggin is not making any claims in this action for damages that Peerless Insurance reimbursed. DSMF ¶ 1.

## II. DISCUSSION

Jurisdiction is based upon diversity of citizenship. Maine law applies.

### (A) Seth Driggin's Standing

■ Goodale argues that Seth Driggin has no standing to bring any claims arising out of the fire because, at the time of the fire, he had no ownership interest in the property, DSMF ¶ 6, nor any right to management fees. DSMF ¶ 7. Mr. Driggin disputes these assertions by stating that he had interests in the property through "marital rights," Pls.' Resp. to DSMF ¶ 6, Seth Driggin Dep. I at 95:16, and that he had been paid management fees by the Compass Rose, the corporation through which he had operated the restaurant of the same name prior to the Pappas Lease. Pls.' Resp. to DSMF ¶ 7; Seth Driggin Dep. I at 76:14.

In this case, the fire could not have invaded Mr. Driggin's legally-protected interests in the property because he had no such interests. With respect to any ownership interest, the deposition testimony that Mr. Driggin cites to support his position reveals that his purported "marital rights" in the property are vague and un-

---

**3.** It is not clear from the record exactly when the split bolt was lost. Johnson evidently believed he still had it at the time of his first deposition in this case, but at his second deposition he indicated that he could not locate it. *See* Johnson Dep. II at 4–8.

certain at best. His statement was: "[T]here probably are a variety of marital or inheritance or other laws that gave me as a spouse some rights to the building." Seth Driggin Dep. I at 95. That statement is insufficient to support an assertion of standing. With respect to any other interests Mr. Driggin might have had in the property, the only evidence he points to—that he had received management fees for operating a restaurant on the property prior to the time it was leased to Pappas—is simply irrelevant. Mr. Driggin has not asserted that at the time of the fire he had any right whatsoever to management fees. Indeed, Mr. Driggin admits that the property had been leased to Pappas with the hope that he would no longer have any management role. Seth Driggin Dep. I at 85.

Moreover, the fact that Mr. Driggin voluntarily incurred miscellaneous expenses [4] in responding to the fire does not give him standing. He cites *Britton v. Dube*, 154 Me. 319, 147 A.2d 452 (1958), to support his claim that he is entitled to recover for those expenses. In *Britton* the court upheld a jury's damage award for a husband's loss of consortium resulting from his wife's inability to perform household duties following an automobile accident in which she was injured. The court held that the husband was entitled to recover for the loss *to him* of those services, *id.* at 454, but noted that his recovery "must not include items recoverable by the wife in her action." *Id.* at 455. The court also stated that the husband was entitled to recover the fair value of the work he performed in caring for his wife. *Id.*

In this case, the expenses Mr. Driggin incurred are properly his wife's. He voluntarily incurred them, evidently while acting as her agent or employee. The fact that she has not reimbursed him does not give him standing to pursue an action against Goodale in this case. Because the expenses are properly his wife's and possibly recoverable by her, *Britton*—far from offering support—actually contradicts Mr. Driggin's argument. The other aspect of *Britton*—that a husband is entitled to the fair value of work performed in caring for his wife—is distinguishable as applicable only in the personal injury context and as resting upon the duties associated with a marital or other close family relationship. Mr. Driggin has not offered any case law or rationale to support extending it to other contexts. In this case the marital relationship is purely incidental to what actually seems to be an employer-employee or principal-agent relationship.

Because Mr. Driggin has no standing, Goodale's motion for summary judgment with respect to Seth Driggin is GRANTED.

### (B) Proximate Cause

Goodale argues that there is an absence of evidence with respect to three aspects of the plaintiffs' case, all bearing on the proximate cause of Ellen Driggin's business interruption losses: (1) her decision to terminate the lease with Pappas; (2) her decision to have Seth Driggin reopen and operate the restaurant for the remainder of the 1998 season; and (3) her decision to enter a less favorable lease with Perkins. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (requiring a demonstration that there is an absence of evidence to support the non-moving party's case).

---

4. These included travel expenses, "losses of tenant assigned to Seth Driggin," and "legal fees," evidently referring to legal work performed by Mr. Driggin, who is an attorney. *See* Pl.'s Answers to Def. Coastal Contractor's Interrogs. ¶ 12.

■ With respect to Mrs. Driggin's decision to terminate the Pappas lease, Goodale has satisfied the required summary judgment demonstration by showing an absence of evidence linking that decision to the fire. In his Statement of Material Facts, Goodale asserts that the "reason for terminating the lease was not related to the fire," and supports that assertion by citing Mr. Driggin's deposition testimony admitting that Pappas had defaulted on certain lease obligations prior to the fire. DSMF ¶ 11. The plaintiffs counter this by asserting that Pappas's "ability to perform under the lease was inhibited by the fire," Pls.' Opp'n at 4, and also by citing to Mr. Driggin's deposition testimony. The cited testimony states, in full: "I recall he cured some of those defaults and promised to cure other [sic] of those defaults. I think I probably agreed at that time, before the fire, to be somewhat patient and some monetary payments [sic] until he opened and his cash flow improved." Seth Driggin Dep. II at 57:3–7. I construe the testimony in the light most favorable to the plaintiffs. I assume that they hope I will infer from it that because the fire precluded Pappas from opening the restaurant his cash flow did not improve and he could not make the payments, causing Mrs. Driggin to terminate his lease. But the testimony does not actually support that implication. It is simply too attenuated. As such, I conclude that the plaintiffs have not reliably demonstrated that a genuine dispute of material fact exists with respect to whether the fire proximately caused the termination of the Pappas lease. There is no evidence that it did.

■ Moreover, the plaintiffs have not demonstrated that any knowledge Mr. Driggin might have regarding how the fire affected Pappas's cash flow—and therefore his ability to pay rent—is based on anything other than conversations Mr. Driggin had with Pappas. As such, it is hearsay evidence, not within any exception, inadmissible at trial, and "cannot be considered on a motion for summary judgment." *Garside v. Osco Drug, Inc.*, 895 F.2d 46 (1st Cir.1990). Therefore, I GRANT Goodale's motion for summary judgment with respect to Ellen Driggin's claims for "business interruption" or financial losses flowing from the termination of the Pappas lease.[5]

■ With respect to Mrs. Driggin's decision to have Mr. Driggin reopen the restaurant and operate it for what was left of the 1998 season, and her later decision—through Staco Realty—to lease the property to Perkins, I find that Goodale has not made the showing required of a party moving for summary judgment. Goodale's initial memorandum and his reply memorandum contain nothing more than conclusory assertions that these decisions were not proximately caused by the fire. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 9–10; Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 3. Nor does his statement of material facts contain anything supporting those assertions. Accordingly, I DENY Goodale's motion for summary judgment with respect to Ellen Driggin's claims for "business interruption" or financial losses flowing from her decision to have her husband reopen and operate the restaurant and her later decision to lease to Perkins.

5. In light of this Order, I am treating as MOOT both the Defendant's Motion to Exclude the Expert Testimony of Nancy Fannon and the Plaintiffs' Motion to Exclude the Expert Testimony of Mark Carrier. Both experts' testimony regarding Pappas's projected revenues is now irrelevant because I have granted summary judgment in favor of Goodale with respect to claims arising out of Ellen Driggin's decision to terminate the Pappas lease. Therefore, at this point I do not know what will be the nature of any expert testimony.

### (C) Damages After the Property Was Transferred to Staco Realty

■ The injury Ellen Driggin suffered was complete on the date of the fire and at that point she accrued a cause of action to recover any damages caused by the injury, including prospective financial losses. Given that Goodale admits that Mrs. Driggin did not assign her cause of action to Staco Realty, that property transfer does not affect her right to recover damages. *See Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So.2d 490, 496 (Fla.Dist.Ct.App. 1994) ("Where the cause of action arises out of an injury to property, that action is personal to the owner of the property and a party who subsequently takes title to the property, without receiving an assignment of that cause of action, may not pursue that cause of action.").

■ Events after the transfer are relevant to Mrs. Driggin's claims only with respect to the *measurement* of her financial losses. The terms of the Perkins lease, for example, may be relevant to determining how much, if at all, the fire reduced the property's rental value. Goodale's fear that he could "be subject to suit by Staco Realty ... after the conclusion of this case" is unfounded. As the plaintiffs note, Staco Realty "suffered no injury based on the conduct of Defendant that is the subject of this case," Pls.' Opp'n at 7, and has not been assigned the plaintiffs' cause of action. As such, Staco Realty would not have standing to bring any claims arising out of the fire. Accordingly, I DENY Goodale's motion for summary judgment on account of the transfer to Staco Realty.

### (D) Spoliation

■ The goals of the spoliation doctrine "are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence." *Collazo–Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 29 (1st Cir.1998).[6] Sanctions for spoliation "may include dismissal of the case, the exclusion of evidence, or a jury instruction on the 'spoliation inference.'" *Vazquez–Corales v. Sea–Land Serv., Inc.*, 172 F.R.D. 10, 13 (D.P.R.1997); *see also Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir.1997) ("Under settled authority, the district court has inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to prevent the non-offending side from suffering unfair prejudice.").

The First Circuit considers the "prejudice to the non-offending party and the degree of fault of the offending party." *Collazo–Santiago*, 149 F.3d at 29. Of these, the First Circuit has implied that it weighs prejudice more heavily than bad faith. *See Trull v. Volkswagen of Am.*, 187 F.3d 88, 95 (1st Cir.1999); *Sacramona*, 106 F.3d at 446 (noting that "[a]lthough deterrence may play a role, the primary aim is remedial, at least absent willful destruction").[7]

---

**6.** While Goodale's memorandum states that the Maine Law Court has not addressed the issue of sanctions for spoliation of evidence, Def.'s Mem. at 15, it is in fact federal law that is applicable. *N. Assurance Co. v. Ware*, 145 F.R.D. 281, 283 n. 3 (D.Me.1993); *Headley v. Chrysler Motor Corp.*, 141 F.R.D. 362, 364–65 (D.Mass.1991).

**7.** District courts in the First Circuit have considered the following five factors in determining whether sanctions for spoliation of evidence are appropriate: "(1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; and

*(1) Prejudice to the Non–Offending Party*

Goodale argues that his ability to develop a defense has been prejudiced because the fire scene had been disturbed in a manner that prevented his expert, Ronald Goulet, from independently determining the cause and origin of the fire, and that Goulet's findings might have been exculpatory. In particular, Goodale argues that Goulet was unable to examine burn patterns because charred floorboards had been removed, was unable to do (or order someone else to do) any testing on the missing split bolt, and was unable to examine the missing fire alarm panel.

As a threshold matter, then, it appears that Goodale has suffered some prejudice. The mere existence of prejudice, however, is an insufficient basis for imposing the relatively severe sanctions for which Goodale has moved. The more important issue in considering the appropriateness of such sanctions is the severity of the prejudice suffered. When Goulet inspected the property on approximately May 6, he did observe the junction box, the circuit breaker panels, the fire alarm panel, structural members, the wiring, and other potential heat sources such as the furnace and heating system. Goodale admits that none of these had been materially altered at the time of Goulet's inspection. PSAMF ¶¶ 27, 33; Def.'s Resp. to PSAMF ¶¶ 27, 33. At that time he also observed the molten remains of the split bolt that allegedly caused the fire. PSAMF ¶ 34; Def.'s Resp. to PSAMF ¶ 34. With respect to the removal of the floorboards, the severity of the prejudice is mitigated by three factors. First, another of Goodale's experts, Kurt Knight, who was on site the day of the fire, did observe the burn patterns on the floorboards. Goodale has designated Knight as an expert who will testify primarily about his observations of the fire scene, but also about his opinions regarding the cause of damage to the junction box. Def.'s Designation of Expert Witnesses at 6–7. Knight was at the fire scene immediately after the fire had been extinguished, he spent time in the basement crawl space, and he observed Maine State Fire Investigator Shepard checking char depths. Knight has personal knowledge of the area where "the most burn occurred," and an opinion as to the cause of damage to the junction box. Second, Goodale's argument raising the possibility that there were burn patterns on the floorboards that were inconsistent with fire investigator Nathaniel Johnson's determination of the cause and origin of the fire rests in significant part on an apparent mischaracterization of Shepard's report. In his report, Shepard states that the fire originated in the crawl space in the basement level of the restaurant. DSMF ¶ 28. Goodale argues that this is inconsistent with Johnson's conclusion that the fire originated in the junction box, which was located just outside of the crawl space. In a subsequent affidavit submitted with the plaintiffs' opposition, however, Shepard states that in his report he "did not mean to suggest or imply that the area of origination might not include the area of the junction box and electrical panels which border the crawl space area of the basement." Shepard Aff. ¶ 11. To the contrary, Shepard's affidavit states that his report is consistent with Johnson's conclusions. Shepard Aff. ¶ 12. Third, Shepard

(5) the potential for abuse if the evidence is not excluded." *N. Assurance,* 145 F.R.D. at 283 (internal parentheses omitted); *see also Vazquez–Corales,* 172 F.R.D. at 13; *Mayes v. Black & Decker (U.S.), Inc.,* 931 F.Supp. 80, 83 (D.N.H.1996); *Allstate Ins. Co. v. Creative Env'i Corp.,* 1994 WL 499760, *6, 28 Fed. R. Serv.3d 1352, (D.R.I.1994) (Lovegreen, Mag. J.); *Headley,* 141 F.R.D. at 365. The First Circuit has not adopted the five factors yet.

took photographs of the underside of the floorboards. Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 5. I recognize that the photographs may not be a good substitute for personal inspection by Goulet, but they do nonetheless mitigate the prejudice the floorboard's unavailability caused.

 With respect to the missing split bolt, the extent of any prejudice is questionable because it is not clear that any testing that might have been performed on it would have been helpful. Goodale relies on the deposition testimony of one of the plaintiffs' experts, electrician Alan Gray, to support his argument that destructive testing on the split bolt would have been "helpful to determining how the split bolt splice was insulated and what torque was supplied." Def.'s Mem. in Support of Mot. for Summ. J. at 18. In an affidavit submitted with the plaintiffs' opposition, however, Gray states that his deposition testimony assumed that the split bolt was intact, that he subsequently examined photographs of the split bolt, and that given how damaged it actually was he believes that "one could not make a determination of the status of the threads or of the torque applied to the split bolt." Gray Aff. at 2.[8]

 With respect to the missing fire alarm panel, Goodale argues that it would have shown "melting and heat or fire patterns," "which connections were intact," and that there is a "reasonable chance that it would give information about the alarm circuits and the telephone wires," which, "in turn, would give valuable information about the sequence of events." Furthermore, Goodale argues, the fire alarm panel's memory would have provided information about the "sequence and timing of each detection zone's activities, thus allowing the parties to tell when and in what zone the fire started and where it spread." Def.'s Reply Mem. in Support of Mot. for Summ. J. at 6–7. This argument has more force because—in contrast to the charred floorboards and the split bolt—the fire alarm panel and its memory were never examined by either party or any expert, and no substitute photographic evidence is available. But they were available to Goodale's expert Goulet at the time of his first inspection.

 Another factor that should be taken into account in assessing the severity of any prejudice is whether the non-offending party bears any responsibility for the prejudice from which he suffers. In this case there are two factors indicating that Goodale bears at least some responsibility for the prejudice. First, Goodale's expert, Goulet, independently curtailed his investigation of the scene at an early date (May 6) after determining that charred floorboards had been removed even though there is no indication in the record that the rest of the scene was disturbed. As noted above, Goodale admits that at the time of Goulet's visit the junction box and electrical control panels remained in place, and the wiring and other potential heat sources had not been materially disturbed. Second, Goulet cannot locate whatever notes,

8. Goodale argues that Gray's affidavit contradicts his deposition testimony, and that an "interested witness may not create an issue of material fact in order to defeat a summary judgment motion simply by disputing his own prior sworn testimony." Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 7. While that may be the general rule, there is a clear exception where the new affidavit is accompanied by a credible explanation for the contradiction. *Colantuoni v. Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994); *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988); *Martin v. Merrell Dow Pharms.*, 851 F.2d 703, 706 (3d Cir.1988); *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985).

sketches, or photos he may have taken during the investigation that he did undertake.

### (2) The Degree of Fault of the Offending Party

This Court cannot ascribe fault to the plaintiffs for any of Johnson's actions because, at the time Johnson investigated the fire, he was not acting on the plaintiffs' behalf, but rather on Peerless Insurance's behalf.[9] There is no indication in the record that the plaintiffs had any authority to control Johnson's investigation in any way, nor that the plaintiffs exerted or attempted to exert any such control. In fact, the plaintiffs did not retain Johnson until October 12, 1999, well over one year after the alleged spoliation occurred. PSMF ¶ 39; Johnson Aff. ¶ 11; Krantz Aff. ¶ 9.

▮▮▮▮ It would be inequitable to sanction a blameless party for another's spoliation of evidence. Bad faith certainly is not required for a sanction to be appropriate. *Trull v. Volkswagen of Am.*, 187 F.3d 88, 95 (1st Cir.1999); *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir.1997) (noting that while bad faith is a "proper and important consideration in deciding whether and how to sanction conduct resulting in the destruction of evidence," carelessness is enough for a district court to consider imposing sanctions). A finding of some degree of fault, however—be it negligence, recklessness, or actual bad faith—certainly makes imposing a sanction more appropriate. Conversely, a finding of no fault makes a sanction less appropriate.

Considering the prejudice to Goodale and the fault of the plaintiffs, I conclude that Goodale has not alleged any facts that would warrant sanctioning the plaintiffs as severely as Goodale has requested. In the course of upholding a district court's denial of a motion to dismiss based on spoliation of evidence, the First Circuit noted that "[a]s a general principle, the court views 'dismissal with prejudice as a harsh sanction, which runs counter to our strong policy favoring the disposition of cases on the merits.'" *Collazo–Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 28 (1st Cir.1998) (quoting *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 107 (1st Cir.1995)) (internal quotations and brackets omitted). In accordance with that policy, courts will impose a sanction only where there is severe prejudice or egregious conduct. *Cf. Vazquez–Corales v. Sea–Land Service, Inc.*, 172 F.R.D. 10, 13 (D.P.R.1997) (noting that dismissal is appropriate "only when a party maliciously destroys relevant evidence for the sole purpose of preventing an adverse party from examining it"); *Mayes v. Black & Decker (U.S.), Inc.*, 931 F.Supp. 80, 83 (D.N.H.1996); *N. Assurance Co. v. Ware*, 145 F.R.D. 281, 282 n. 2 (D.Me.1993). In this case, I find no such prejudice or conduct. Accordingly, I reject the argument that dismissal is appropriate. Similarly, in light of the considerations discussed above, I conclude that that excluding Johnson's testimony would be too severe a sanction.

It is important to note, however, that my findings with respect to sanctions for spoliation are preliminary. I merely conclude that on the facts presented at this stage in the proceeding the relatively severe sanctions that Goodale has requested are not warranted. I do not rule out the possibility that these or other sanctions—such as a negative inference jury instruction or more targeted exclusion of certain aspects of Johnson's testimony—may be appropriate at a later stage.

9. *See supra* note 1 and accompanying text.

### III. Conclusion

Goodale's motion for summary judgment is GRANTED as to all claims of Seth Driggin; GRANTED as to the termination of the Pappas lease; and in all other respects is DENIED.

So ORDERED.