STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, SS.                          Docket No. CV-2014-0129


Michael Wuestenberg and          )
    Rosemarie Wuestenberg,       )
        Plaintiffs,          )
                         )
                         )
        v.            )          **Findings, Order, and Judgment**
                         )
                         )
Harry J. Rancourt, III and       )
    Stephanie J. Rancourt,       )
        Defendants.   )


## Introduction

This case arises out of the sale by the Rancourts to the Wuestenbergs of a house located at 363 Sawyer Road in Hampden, Maine. The Rancourts, millwrights by trade, developed over the years a side business of building and then selling houses. The house they sold to the Wuestenbergs was built for themselves rather than for their business. They lived in it for more than a decade before the sale.

Certain defects in the house were observed by the Wuestenbergs and others before the sale but the full magnitude of these shortcomings was not appreciated until after the transaction was complete. Other defects became known only after thorough post-sale examinations by professionals. Both to remedy the defects and to realize their desire to alter the residence, the Wuestenbergs undertook substantial remediation and reconstruction before they moved into the house. This post-sale construction cost hundreds of thousands of dollars. In part because of financial difficulties, the Wuestenbergs were unable to occupy the house for more than two and a half years after the purchase.

The Wuestenbergs sued the Rancourts by complaint dated July 25, 2014, for damages they claim arise out of the defects in the house. An amended complaint was filed on February 9, 2016, followed by a second amended complaint, which was allowed by order dated June 28, 2016. Of the 11 counts in the second amended complaint, 8 survived the court's order on summary judgment dated March 17, 2017. The remaining counts were presented in a bench trial conducted on March 12, 13, 15, 16, 19, 20, 22, and 23; and on July 9, 10, 11, 12, 13, 18, and 20, 2018. Thereafter, counsel submitted written summations and the court heard oral argument on November 1, 2018. The case is now in order for decision.

At trial, Plaintiffs were represented by Attorneys Timothy Woodcock and David Pierson and Defendants by Attorney David Herzer. The court renews in writing its thanks to counsel for their courtesy to the witnesses, their cooperation in managing an

BANGOR COURTS
JAN 15 '19 PM 2:57

1

ever more complex marking system for hundreds of exhibits, and their concentration of presentational effort on issues rather than ephemera. Before, during, and after trial, they have served their clients and the court well.

## Spoliation

A threshold issue for the court's analysis is the Rancourts' claim that certain evidence or claims should be precluded because the evidence of their alleged inadequate construction was lost in the Wuestenbergs' rebuilding. The parties analyzed this issue with accompanying citations to a number of cases, none of them precisely apposite to the situation presented but all of them informative. For this court's analysis, the summary of elements presented in **Driggin v. American Security Alarm Co.,** 141 F. Supp. 2d 113, 120 (D. Me. 2000) is particularly useful:

> (1)*Whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded.*

The prejudice resulting from Plaintiffs' construction efforts, if any, cannot be cured. All of the other factors cited militate against a sanction based on spoliation. The court specifically finds the Wuestenbergs acted in good faith in rebuilding the house they had bought so that they could live in it. There seems no realistic hazard that any person would view this court's decision on the issue as a license for spoliation in the future. And, mostly, Plaintiffs' reconstruction seems not to have had any effect on the case: through weeks of trial and hundreds of pages of argument, the Rancourts appeared unhampered in their defense of the Wuestenbergs' claims. For the foregoing reasons, Defendants' request for sanctions based on spoliation must be DENIED.

## Claims and Elements

The Wuestenbergs seek damages for claims presented in Counts I, II, and III (all sounding in fraud); IV (negligent misrepresentation); VII (negligence); IX (violation of the Unfair Trade Practices Act); and XI (breach of contract requiring mediation). They also seek punitive damages in Count X. The court first lists the elements of each cause of action:

Counts I, II, and III: These claims are interrelated though not entirely overlapping. Plaintiffs seek damages arising out of certain claimed communications and silences they assert are actionable as common law fraud or as violations of the statute requiring certain disclosures from sellers to buyers of residential real estate.

To recover for common law fraud, Plaintiffs must prove that Defendants made a material misrepresentation that was false, was known to be false or was made recklessly as an assertion of fact without knowledge of its truth or falsity, and was made with the intention that it be acted upon. Further, Plaintiffs must show they acted on the material misrepresentation with resultant damages. **Letellier v. Small,** 400 A.2d 371, 373 (Me. 1979); **see also Fitzgerald v. Gamester,** 658 A.2d 1065, 1069 (Me. 1995). Actionable conduct includes not only false affirmative statements but either active concealment of

2

the truth or silence when there is an affirmative duty to disclose. **Fitzgerald**, 658 A.2d at 1069.

Maine's Property Disclosure Act, 33 M.R.S §§ 171-179 (2017), affirmatively requires certain disclosures from sellers to buyers. Pertinent to the Wuestenbergs' claims, this requires disclosure of "known defects," defined as "a condition, known by the seller, that has a significant adverse effect on the value of the property, significantly impairs the health or safety of future occupants of the property or, if not repaired, removed or replaced, significantly shortens the expected normal life of the premises." 33 M.R.S. § 171(1).

Count IV: This claim sounds in negligent misrepresentation, an alternative theory of recovery based on the communications underlying Counts I, II, and III. The elements of negligent misrepresentation are as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information, for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or comunicating the information.

**Binette v. Dyer Library Association**, 688 A.2d 898, 903 (Me. 1996) (quoting Restatement (Second) of Torts § 552(1) (1977)).

Count VII: This claim sounds in negligence and seeks recovery for the Rancourts' flawed design, construction, and alteration or modification of the house. The basic elements are the same as in any negligence case: duty, breach, causation, and resulting damages. **See Searles v. Trustees of St. Joseph's College**, 1997 ME 128, ¶ 5, 695 A.2d 1206.

Count IX: This claim asserts violation of Maine's Unfair Trade Practices Act, found at 5 M.R.S. §§ 205-A – 214 (2017). To prevail on this claim, the Wuestenbergs must at the outset establish that their purchase of the house took place in a business context. **Binette**, 688 A.2d at 907. Thereafter, they must establish that the Rancourts' actions constituted unfair or deceptive practices, as defined by law, that caused the Wuestenbergs a financial loss. Unlike the foregoing claims, a claimant under the UTPA need not show the offending party had a culpable state of mind. **State v. Weinschenk**, 2005 ME 28, ¶ 17, 868 A.2d 200 (citing **Binette**, 688 A.2d at 906).

Count X: Plaintiffs seek an award of punitive damages. To recover them, they must first show that Defendants committed a tort; thereafter, they must prove by clear and convincing evidence that Defendants acted with express or implied malice. This well known standard was articulated in the seminal case of **Tuttle v. Raymond**, 494 A.2d 1353 (Me. 1985).

Count XI: In this count, Plaintiffs seek damages for Defendants' failure to participate in mediation, thereby violating a clause in the parties' contract that required mediation before filing of a civil action. To prevail on this claim, Plaintiffs must prove that Defendants refused to mediate. **Thompson v. Cloud**, 764 F.3d 83, 91 (1st Cir. 2014).

3

## Findings of Fact and Analysis

- The House

The house the Wuestenbergs bought from the Rancourts was substantially flawed from the tip of the roof to the drainage system underneath. The Rancourts based its design on plans drafted by an architectural firm, Donald A. Gardner Architects, Inc., which they found in a book and purchased. Mr. Gardner and his colleagues designed the house for construction in the southern United States, where the snow load a house must bear is substantially less than that in northern New England; as a result, the house would have been structurally inadequate even had it been built exactly as Mr. Gardner designed. As finally built, the house deviated from Mr. Gardner's plans in ways that further compromised its design integrity.

A non-exhaustive inventory of deficiencies in the house would begin with the roof, the supporting members of which were not large enough, or closely enough spaced, or adequately braced, to withstand the local climate. The inventory would then extend downward through the framing of the house all the way to the basement. Throughout the house frame were structural elements inadequate to the functions imposed on them by both the design of the house and the climate in Maine, aggravated by Mr. Rancourt's alteration of materials and various improvisational adjustments that unnecessarily stressed the materials and increased the hazard of catastrophic failure. One of the most prominent of these changes was the removal of a lally column in the basement, which was replaced inadequately by steel plating affixed to the cross member above.

Further deficiencies included persistent leaking from a window in the second floor bathroom, a bathroom exhaust fan that was not vented to the outside, a leak in an upstairs bedroom, badly installed insulation, an improperly built chimney, and a system to drain the foundation that was inadvertently installed to run uphill. Another was the problem that alerted the Wuestenbergs their purchase might have been mistaken: moisture on the sunroom wall that turned out to be the result of a longterm leak. When the wall covering was pried from the frame, the Wuestenbergs found the interior surface was black with mold.

- Defendants' knowledge as an element of Plaintiffs' claims

The Wuestenbergs' claims in Counts I, II, and III are all dependent on the state of the Rancourts' knowledge. In Counts I and II, the Rancourts' alleged knowledge is of the defects in the house, both their existence and their severity. Count III is based on the Rancourts' alleged knowledge of their possession of the Gardner plans and the specific relevance of those plans to the Wuestenbergs. In analyzing these three claims, the court accepts Defendants' assertion that their entire fund of relevant knowledge was possessed by Harry Rancourt. Although Stephanie was an experienced builder who had personally participated in building the house (and had then lived in it), Mr. Rancourt knew everything about the construction and condition of this house that Ms. Rancourt knew, and she knew nothing he did not. (Def.s' Sum. & Br. 3, n.2.)

4

Plaintiffs argue three bases for finding Harry Rancourt possessed knowledge critical to their claims. In doing so, they view his every potential misstatement, omission, or error through a lens of deep suspicion, leading them to damning conclusions about every ambiguity. First, the Wuestenbergs point to elements of the record they see as directly proving Mr. Rancourt's knowledge. Second, they cite evidence from which they believe his knowledge should be inferred. More generally, they assert that the relevant knowledge should be attributed to him, based on his general experience as a builder and his specific involvement in constructing and then altering this house.

The specific knowledge Plaintiffs believe Mr. Rancourt possessed, and upon which Counts I and II rest, includes the following:

- The steel plate reinforcements he had used in place of the absent lally column were failing;
- The leaks in the sunroom and master bathroom were severe, as revealed after the closing;
- The venting to the master bathroom had been improperly constructed so as to defeat its purpose;
- The chimney had been improperly constructed and was therefore unsafe;
- The footing drains could not evacuate water because they had been badly built so as to run uphill;
- An underground electrical line had been improperly installed;
- Insulation had been poorly installed;
- Rafters were of improper size, were improperly spaced, and were inadequately reinforced;
- The framing of the house had not been properly designed, constructed, bridged, or reinforced;
- Load bearing walls were overburdened due to inadequate size and were reinforced with elements that had been cut, diminished, mutilated, or otherwise altered so as to compromise their functioning;
- At least one necessary reinforcing element, a jack stud in a bearing wall, was absent; and
- The sunroom rafters had been improperly designed and installed.

Count III is based on the Rancourts' failure to provide "blueprints" in the form of the Gardner Plans when that requirement was specified in the original purchase and sale agreement proposed by the Wuestenbergs. The Rancourts claimed not to have blueprints but, by agreement, substituted "building specifications." This change was of consequence because production of the Gardner Plans by the Rancourts, had production been followed by close examination by the Wuestenbergs and their consultants, might have alerted Plaintiffs that the house had been designed for a milder climate and had then been built so as to aggravate rather than alleviate its deficiencies. Had they possessed this knowledge, the Wuestenbergs could have declined to close on the property or could have negotiated different terms for its purchase.

Mr. Rancourt was called as a witness by the Wuestenbergs. His testimony, which was intended to prove their suspicions, extended for 22 hours spread out over 4 days:

5

March 12 and 13, and 15 and 16, 2018; after which it was supplemented in a deposition dated July 31. To describe the examination of Mr. Rancourt as thorough would be understatement to the point of falsehood. The Wuestenbergs' lawyer's questioning of Mr. Rancourt was exhaustive. It explored every possible detail and nuance of Mr. Rancourt's memory, challenging the witness and refreshing his memory with numerous documents. The examination was supple and responsive, departing from counsel's basic script to follow every lead Mr. Rancourt's answers offered. Questions to Mr. Rancourt explored what he did in building the house, why he did it, what he knew, when he knew it, to whom he spoke about it, what he said, and what he meant when he said it. Throughout this examination, Mr. Rancourt never directly admitted having spoken falsely or concealed evidence of flaws in the house. (Neither did Ms. Rancourt during her own extensive cross examination.) Plaintiffs' claims must therefore be predicated on the court interpreting Mr. Rancourt's answers, in light of his experience, as proving knowledge he claimed not to have had.

The court does not interpret Mr. Rancourt's testimony as Plaintiffs urge. The court concludes and finds as fact that Mr. Rancourt is an untrained, rough-and-ready, improvisational builder; that he committed amateurish errors in construction that compromised the safety and durability of the house; and that he was unaware of the shortcomings in his performance (or, in the case of the leaks, of the magnitude of his errors) until this dispute arose and experts were called in to inspect his work. The court's view of Mr. Rancourt's testimony is reinforced by the failure of Raymond Pipes, the building inspector of the Town of Hampden responsible for approving the house, or of any other inspecting or licensing authority, to call the Rancourts' work into question as the house was being built. This comprehensive failure to discern construction defects was not alleviated by an inspection undertaken by home inspector Reese Perkins at the Wuestenbergs' behest following the parties' entry into the purchase and sale agreement. That inspection, the results of which were recorded in Jt. Ex. 9, recorded issues related to electical outlets, handrails, smoke detectors, and other items that might require remediation. With respect to the category of Major Defects, the entry in the report is "None."

That the Rancourts lacked knowledge of what were later identified as critical flaws in the house was further reinforced by their occupancy in it, for years, without record evidence that they ever suspected its shortcomings. Also bearing on the court's assessment of Mr. Rancourt's testimony is his stubborn, mistaken, insistence that he had built the house "to Code." The record does not show the Rancourts were provided with and then disregarded needed guidance when they built the house, or that they learned of the existence and magnitude of its deficiencies as they lived in it; to the contrary, the record shows their critical lack of knowledge was never alleviated.

Although Mr. Rancourt's testimony concerning when he observed and repaired the leaks of which Plaintiffs complain was not consistent across his trial testimony and his deposition, the court evaluates those inconsistencies as being the product of a flawed memory rather than purposeful concealment. The overall impression Mr. Rancourt's testimony generated was that, whatever the historical details—which he tried to recapture, years after the events—he believed he had identified and remedied these defects. It is more likely than not, and the court finds as fact, that Mr. Rancourt simply did not know how serious the damage from leaks was, rather than that he knew about it

6

and covered it up in order to sell the house. In accordance with this finding is Reese Perkins's use of a moisture meter in the sunroom to determine whether there was residual wetness. The result of that inquiry was negative, which undermines Plaintiffs' contention that the presence of moisture was inevitably knowable to Defendants as residents of the house.

The court's evaluation of the knowledge element of Count III is similar. Here, the knowledge the Rancourts are alleged to have had is that the Wuestenbergs specifically wanted "blueprints" for the house and that the Rancourts resisted producing them because to do so would have jeopardized the sale. The evidence, taken as a whole, shows otherwise. All of the requests and responses relating to plans for the house can be explained, in part, by what the court sees as critical ambiguities: Did "blueprints" mean the plans the Rancourts used as a template; or did it mean the plans used as a template, but only in the full sized form in which they were actually used (in either of which case they did exist and were eventually produced); or did it mean architectural drawings of the house as built, in which case they did not exist to be produced. Also at issue is how critical to the transaction the desire for blueprints actually was.

The court concludes the Rancourts were to be believed when they testified they looked for the Gardner Plans and could not find them, then produced them as soon as they surfaced. This conclusion is not undermined by the Rancourts' possibly inefficient search for the plans and their varying recollections of when and why they finally looked in the place where the plans were found. This conclusion is reinforced by the detriment to the Rancourts' defense that was generated once the plans were found and turned over. The plans demonstrated that the house had originally been designed for a climate other than the one in which it was built, and that the actual building of it had further compromised its durability and safety. By producing the plans, the Rancourts turned over evidence strongly supportive of the Wuestenbergs' contention that the house had been badly built.

- Analysis of individual claims

Count I (Fraud—False Representations and Active Concealment) and
Count II (Fraud—Failure to Disclose Known Defects):

These two counts seek recovery for different defects in the residence on common factual and legal bases for proposed liability. Count I addresses the missing lally column and sagging overhead beam in the basement, the leak in the sunroom, and the leaks in the master bathroom and upstairs bedroom. Count II concerns the structural deficiencies that arose from the Rancourts' deviation from the Gardner Plans and their failure to build in accordance with local standards. In each count, Plaintiffs allege both common law fraud and violation of the disclosure requirements imposed on Defendants by 33 M.R.S. § 173(5). Because the court has found that the defects of which Plaintiffs complain actually did substantially exist, the contested elements of each claim concern the state of Defendants' knowledge of these shortcomings.

As discussed above, the court concludes the Rancourts did not have actual knowledge of the critical defects in their house. They thought their construction had been proper

7

and their belief was reinforced both by the approval afforded by the housing inspector and by their own experience of living in the house for years without, for example, suffering a collapsed roof. The evidence did not show the Rancourts were aware of subtle defects (like the mis-installed insulation or the improperly built chimney) or the magnitude of observed defects (the leaks in the sunroom and upstairs). Neither is the court persuaded such knowledge should be attributed to them. Their on-the-job training in building houses did not teach the Rancourts that the lally column was irreplaceable by the means they chose or that the bathroom vent fan had been improperly installed. Counts I and II fail because, the court finds, Defendants did not have the knowledge and understanding critical to each cause of action.

Neither were Defendants' statements reckless. They held the mistaken belief that their construction had been adequate, their experience living in the house reinforced that belief, and they therefore did not have reason to believe further inquiry was required. **See** **Amort v. Tupper**, 282 P.2d 660, 664 (Ore. 1955) (quoting 3 Pomeroy's Equity Jurisprudence, 5 ed., 479, § 884a) ("In other words, a definite statement of a material fact made by a party who does not know the statement to be true, and has no 'reasonable grounds for believing it to be true, will, if false, have the same legal effect as a statement of what the party positively knows to be untrue.'")

Count III (Fraud—Material Misrepresentation as the Existence of Gardner Plans)

Hour after hour of testimony about "plans" persuades the court that the parties in their negotiations used words in common but assigned them variant meanings. (This irregularity became of interest only when the Wuestenbergs found their new house was flawed.) The court finds as fact that the Rancourts did not understand they were being asked at the time of the sale for the exact plans from which they departed when they built the house or, if they did understand it, they did not know where those plans were. For this reason, Plaintiffs' claim in Count III must fail.

Count IV (Negligent Misrepresentation) and
Count VII (Negligence)

The parties present layered, nuanced arguments pertaining to the existence of a duty breachable in tort under the unusual circumstances of this case. The court need not resolve those arguments because, even assuming a breachable duty existed, both of these claims must fail for two other reasons. First, the Rancourts did not possess the knowledge the Wuestenbergs blame them for not providing, and they had no reason to know it in light of their uneventful interaction with inspecting authorities and their residence in the house for over a decade. Second, even if the Rancourts were negligent, Plaintiffs' recovery would be barred by the Wuestenbergs' comparative negligence.

14 M.R.S. § 156 (2017) provides, in part, that when a claimant *"is found by the jury to be equally at fault [with the tortfeasor], the claimant may not recover."* In the purchase and sale agreement, the Wuestenbergs specified fourteen separate investigations (out of twenty four listed) that they intended to have performed before closing. Among these were inspections that would have addressed the deficiencies they now claim, including "General Building" (which would have scrutinized the framing), "Energy Audit," "Chimney," and "Mold." By foregoing these inspections and indeed advancing the

8

closing by fifteen days, the Wuestenbergs failed to exercise ordinary care to at least the same degree as they attribute to the Rancourts.

The absence of the lally column leads to the same conclusion. No inspection was required to discern this condition—it was as open and obvious to the Wuestenbergs as it was to the Rancourts.

It is difficult not to feel sympathy for the Wuestenbergs in their haste to complete the purchase. They had found an attractive house that fulfilled their desires and they wanted to begin renovating it. Nonetheless, they had and then declined an opportunity for diligent evaluation, an opportunity which was explicitly recorded in their purchase and sale agreement and which they read and evaluated before signing. If the dispute between these parties is in any respect a negligence case, the Wuestenbergs' negligence in the transaction precludes recovery.

Count IX (Violation of the Unfair Trade Practices Act)

The threshold issue presented is whether the Rancourts engaged in a business transaction when they sold their personal house rather than a house they had built for immediate sale. The cases the parties cite do not resolve this issue directly. Certainly the Rancourts handled the transaction differently than they handled those within what they saw as the scope of their house building and selling business. The court notes that a plumber operating a sole proprietorship probably could not repair a pipe for anyone under any circumstances that would fall outside the scope of that business, but the sale of a house is less specifically skill-based. For purposes of this analysis, the Rancourts' sale of their personal residence appears not to fall within the scope of their business.

This distinction in types of transactions, although interesting, becomes academic when the court examines the Rancourts' actual conduct. For all the reasons noted in discussion of Counts I, II, and III above, the Rancourts did not commit an unfair or deceptive act in selling their house. They were as surprised as the Wuestenbergs to learn of the existence and magnitude of the deficiencies identified after the transaction. For this reason, Count IX must fail.

Count X (Punitive Damages)

The court finds as fact that the Rancourts committed no conduct that reaches the legal standard for imposition of punitive damages, no matter which stated cause of action is invoked as a basis.

Count XI (Breach of Contract—Purchase and Sale Agreement)

Plaintiffs' claim for breach of contract is based on Defendants' alleged refusal to mediate this dispute, as required in the purchase and sale agreement. The Wuestenbergs do not argue that the Rancourts specifically refused to mediate. They infer the Rancourts purposely declined to mediate, adopting the conclusion advanced by Liz Andrews, the administrator of the Maine Residential Real Estate Mediation Program, in her letter to the parties dated May 30, 2013. (Exh. 240). In that letter, having not received a response to her inquiries from the Rancourts, she stated, "This letter is to

certify Harry and Stephanie Rancourt's refusal to mediate under the Mediation Clause of the Purchase and Sale Agreement…" The Wuestenbergs see Ms. Andrews's conclusion as having been reinforced by the Rancourts' counsel's communication with Plaintiffs' attorneys at about the same time, when he did not affirmatively propose to mediate but instead offered to accept service of the Wuestenbergs' complaint.

The record fairly generates the issue of refusal but also resolves it. Testimony and correspondence alike demonstrate that communications from the MRREMP to the Rancourts were impeded by Defendants' temporary residence for work out of state, and that conveyance of Plaintiffs' demand to mediate was muddied by the involvement of both a realtor and counsel.

Communication concerning pre-filing mediation was similar to that underlying the Rancourts' initial failure to produce the Gardner Plans—everyone acted in good faith and no one did anything wrong. Clarity would have been advanced had counsel for the parties specifically discussed mediation between themselves before the complaint was filed, but the absence of mediation was not predicated on a refusal or any other conduct by Defendants that constituted a breach of contract. **See Thompson v. Cloud**, 764 F.3d 82 (1st Cir. 2014).

## Conclusion and Entry of Judgment

This case has been extraordinarily lengthy, involved, and expensive for both sets of parties. The court's finding that there was no actionable misconduct by the Rancourts does not minimize the monetary and emotional cost of the dispute to the parties. The record presented, however, compels that finding and precludes recovery.

The entry will be:

Defendants' Motion *in limine* based on spoliation is DENIED.

JUDGMENT shall enter for Defendants on Counts I, II, III, IV, VII, IX, X, and XI of Plaintiffs' Second Amended Complaint.

The Clerk may incorporate this Order and Judgment upon the docket by reference.

Dated: January 15, 2019

The Hon. Bruce C. Mallonee
Justice, Maine Superior Court

10

MICHAEL WUESTENBERG ET AL VS HARRY J RANCOURT III ET AL

CASE #:BANSC-CV-2014-00129

----------------------------------------------------------------------

| SEQ | TITLE | NAME | | DOB | ATTY |
|-----|-------|------|---|-----|------|
| 001 | PL | MICHAEL WUESTENBERG | Tim Woodcock Esq & David Pierson Esq | | T |
| 003 | PL | ROSEMARIE WUESTENBERG | " " | / / | T |
| 002 | DEF | HARRY J RANCOURT III | David Herzer, Esq. | / / | T |
| 004 | DEF | STEPHANIE J RANCOURT | David Herzer, Esq. | / / | T |