David BINETTE et al.

v.

DYER LIBRARY ASSOCIATION et al.

Supreme Judicial Court of Maine.

Argued June 10, 1996.
Decided Dec. 13, 1996.

John C. Bannon (Orally) Murray, Plumb & Murray, Portland, for Plaintiffs.

John A. Ciraldo (Orally) Perkins Thompson Hinckley & Keddy, Portland, S. James Levis, Jr. (Orally) Levis & Hull, Biddeford, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, RUDMAN, and LIPEZ, JJ.

RUDMAN, Justice.

David and Karen Binette appeal from the summary judgments entered in the Superior Court (York County, *Fritzsche, J.*) in favor of the Dyer Library Association, Clifford Purvis, and Vacationland Realty on the Binettes' claims of negligent misrepresentation and violation of the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S.A. §§ 205–A to 214 (1989 & Supp.1995). The Binettes argue (1) that the Dyer Library Association, Purvis, and Vacationland Realty breached a duty of reasonable care by omitting to tell them of the existence of a 3000–gallon underground oil tank on property owned by the library association and sold to the Binettes, (2) that the defense of charitable immunity, 14 M.R.S.A. § 158–A (Supp.1995), is not available to Purvis on their claim for negligent misrepresentation, and (3) that the defendants' failure to disclose the existence of the tank to them prior to the sale constitutes an unfair and deceptive act in violation of section 207 of the UTPA. We affirm in part and vacate in part the summary judgments entered in favor of the defendants.

The Dyer Library Association, a charitable corporation, operates a library and a museum in Saco. In 1987 the library association acquired a residential property in Saco on the death of Joseph Deering. The Deering property harbored a 3000–gallon underground heating oil storage tank registered by Deering with the Department of Environmental Protection. The library association listed the property for sale with Vacationland Realty, a partnership in which Clifford Purvis and another were partners. In addition to being a licensed real estate broker, Purvis was a trustee and officer of the Dyer Library Association. In July 1988 David and Karen Binette bought the Deering property for $351,000. The library association paid a sales commission of $8,775 to Vacationland Realty.

The Binettes contend that they learned of the existence of the oil tank only after the closing, when their first oil delivery was made. They contend they were forced to have the tank removed because it was corroded and allowed oil to leak into the ground and water to leak into their fuel oil, contaminating their property and destroying their heating system.

In 1994 the Binettes filed a three-count complaint against the Dyer Library Association, Vacationland Realty, and Clifford Purvis for fraud, negligent misrepresentation, and violation of the UTPA. The Binettes later voluntarily dismissed their claims for fraud. The court granted a motion for summary judgments filed by defendants Purvis and Vacationland Realty pursuant to M.R.Civ.P. 56. The Binettes filed pursuant to M.R.Civ.P. 59(e) a motion to amend the summary judgments granted to Purvis and Vacationland Realty, and the Dyer Library Association filed its own motion for a summary judgment. The court denied the Binettes' motion to amend the Purvis and Vacationland judgments and entered a summary judgment in favor of the Dyer Library Association. This appeal followed.

■ A summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. M.R.Civ.P. 56(c). When reviewing a grant of a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment is granted and review the trial court's decision for error of law. *Petillo v. City of Portland,* 657 A.2d 325, 326 (Me.1995). A summary judgment is an extreme remedy and should be granted in favor of a defendant only when the facts before the court so conclusively preclude recovery by the plaintiff that a judgment in favor of the defendant is the only possible result as a matter of law. *Spickler v. Greenberg,* 586 A.2d 1232, 1234 (Me.1991).

A plaintiff may avoid a summary judgment for the defendant as a matter of law on a given claim by establishing a *prima facie* case for each element of the claim for which the plaintiff will bear the burden of proof at the trial. *Fleming v. Gardner*, 658 A.2d 1074, 1076 (Me.1995). In this case, before we may measure the *prima facie* evidence on the record against the elements of the Binettes' claims for negligent misrepresentation and violation of the UTPA, we must review as a matter of law the trial court's construction of certain of those elements. We review the trial court's decisions in matters of law *de novo*. *Collins v. Trius, Inc.*, 663 A.2d 570, 572 (Me.1995).

## I

We consider one by one the Binettes' claims against the three defendants for negligent misrepresentation. We begin by determining that a genuine issue of material fact remains as to whether Clifford Purvis is entitled to the statutory defense of charitable immunity.

A "volunteer" providing services for a charitable organization is entitled to immunity from a claim sounding in negligence if the cause of action arises from a personal act that "occurs within the course and scope of the activities of the charitable organization" and the act is "without compensation." 14 M.R.S.A. § 158–A (Supp.1995). The Binettes argue that Purvis is not entitled to charitable immunity for two reasons: first, that he was not acting within his capacity as an officer when he sold them the Deering property, and second, that he was compensated for his part in the sale and therefore was not a volunteer.

Whether Purvis was acting in his capacity as an officer of the library association in selling real estate on its behalf is irrelevant for purposes of charitable immunity as long as he was acting as an uncompensated volunteer within the scope of the library's charitable activities. The Legislature in 1971 amended the 1881 private and special legislative act establishing the Dyer Library Association to authorize the following activities:

> To have, receive and hold in fee simple or in any less estate by purchase, gift, grant, devise, bequest or otherwise, real estate and personal property, whether tangible or intangible to any amount; to borrow money and to mortgage and pledge its interest in any property to secure the same; and to purchase, sell, manage, operate, control and otherwise deal in real and personal estate of any name or nature. . . .

P. & S.L.1971, ch. 36, § 3(b). It is clear that Purvis was acting within the legislatively defined course and scope of the activities of the Dyer Library Association when he sold the Deering property for the library. Whether Purvis also was acting as an uncompensated volunteer on behalf of the library when he sold the Deering property to the Binettes, however, remains a genuine issue of fact.

The record includes evidence that the Deering Library Association by an oral agreement arranged to have Vacationland Realty, a partnership in which Purvis was a partner, market the Deering property for the Dyer Library Association. By the terms of the agreement Vacationland Realty would market the property, but Purvis would forego his share of the commission. Purvis dealt with the Binettes, who ultimately became the successful bidder; Purvis's partner dealt with the competing bidder. The library association wrote a check for half the usual sales commission payable to Vacationland Realty. The check was deposited to Vacationland's account, although the record includes evidence that the funds immediately were withdrawn in their entirety by Purvis's partner.

Viewed in the light most favorable to the Binettes, the record establishes that Purvis's partnership received compensation for the sale of the Deering property. A question of fact remains, therefore, as to whether Purvis himself acted without compensation in selling the Deering property for the Dyer Library Association. The court erred in granting Purvis's motion for a summary judgment on the ground he was entitled to charitable immunity.

## II

We consider next whether the court erred in granting the Dyer Library Association's

motion for a summary judgment on the Binettes' claim for negligent misrepresentation.

"Maine has adopted section 552 of the Restatement (Second) of Torts as the appropriate standard for negligent misrepresentation claims." *Bowers v. Allied Inv. Corp.*, 822 F.Supp. 835, 839 (D.Me.1993) (citing *Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 615 (Me.1992)). The Restatement (Second) provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information, for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). The entry of a summary judgment in favor of the defendant library association is improper if the record establishes *prima facie* evidence that the Dyer Library Association (1) in a transaction in which the association had a pecuniary interest (2) supplied false information for the guidance of the Binettes (3) without exercising reasonable care or competence and that (4) the Binettes justifiably relied on that false information in their purchase of the Deering property.

### A Transaction of Pecuniary Interest

The Dyer Library Association does not dispute that the transaction here was one in which the association had a pecuniary interest.

### Supplying False Information

■ Before we can assess whether *prima facie* evidence on the record establishes that the Dyer Library Association supplied false information to the Binettes, we must determine as a matter of law what may constitute the supplying of false information. The Dyer Library Association said nothing to the Binettes concerning the underground oil tank. The library association argues that liability for negligent misrepresentation requires the affirmative supplying of false information. We disagree.

We have adopted for purposes of *fraudulent* misrepresentation the doctrine that an omission by silence may constitute the supplying of false information. *Horner v. Flynn*, 334 A.2d 194, 203 (Me.1975), *overruled on other grounds by Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139 (Me.1984). We now hold for purposes of *negligent* misrepresentation that, although not every failure to disclose constitutes a misrepresentation, silence rises to the level of supplying false information when such failure to disclose constitutes the breach of a statutory duty.

■ Pursuant to 38 M.R.S.A. § 563(6) (1989),[1] which became effective September 27, 1987, the owner of real estate on which an underground oil tank is located must file written notice of the existence of the tank prior to the sale or transfer of that real estate. Section 563(6) is a safety statute. 38 M.R.S.A. § 561 (1989 & Supp.1995).[2] Buyers of real estate on which an underground oil tank is located are vulnerable to the dangers of an oil leak on the property and are among those the statute is intended to protect.

---

1. 38 M.R.S.A. § 563(6) (1989) provides:

 **6. Providing notice.** Prior to the sale or transfer of any real estate where an underground oil storage facility is located, the owner of the real estate shall file a written notice with the purchaser or transferee. The notice shall disclose the existence of the underground oil storage facility, its registration number or numbers, the real estate where the facility is located, whether or not the facility has been abandoned in place pursuant to section 566–A and that the facility is subject to regulation, including registration requirements, by the department under this subchapter.

2. 38 M.R.S.A. § 561 (1989 & Supp.1995) provides in pertinent part:

 The Legislature intends by the enactment of this subchapter to exercise the police power of the State through the department by conferring upon the department the power to deal with the hazards and threats of danger and damage posed by the storage and handling of oil in underground facilities and related activities. . . .

 Section 561 in essentially the same form became effective June 28, 1985. P.L.1985. ch. 496, Part A, § 14.

Section 563(6) does not limit the disclosure requirement to those sellers who know of an underground storage tank on their property. The statute's disclosure requirement, rather, is absolute. Section 563(6) mandates that when an underground oil tank exists on property for sale the seller of that property may not remain silent.

### A Duty of Reasonable Care

 Because the evidence establishes that the Dyer Library Association owed the Binettes an absolute statutory duty to disclose the existence of the underground oil tank, the library association's silence regarding the tank constitutes supplying false information as a matter of law. Although Maine does not recognize the doctrine of negligence *per se,* violation of a safety statute constitutes evidence of a breach of a duty of reasonable care owed to those the statute is designed to protect. *Dongo v. Banks,* 448 A.2d 885, 889 (Me.1982). *See generally Jones v. Billings,* 289 A.2d 39, 41 (Me.1972). The Dyer Library Association's failure to disclose the tank, a violation of section 563(6), is evidence of a breach by the library association of a duty of reasonable care owed to the Binettes, and can be considered by a factfinder along with other evidence relevant to the "reasonable care" element of the tort of misrepresentation.

### Justifiable Reliance

 David Binette testified he believed the property he bought from the Dyer Library Association would have been maintained by the well known Deering family with "the best" heating system. He testified he bought the property in the belief that the heating system was "perfect." The record, therefore, includes evidence that the Binettes bought the Deering property in reliance on the library association's failure to disclose otherwise.

 The Binettes' testimony, viewed in the light most favorable to them, establishes *prima facie* evidence that the Binettes did not know of the underground tank prior to the sale and furthermore that its existence

was not obvious. When, as here, the defendant is under a duty to disclose, a plaintiff need not investigate the truth of the defendant's silence in order to be held to have relied justifiably on that silence. Given the existence at the time of the sale of a statute requiring the Dyer Library Association to inform the Binettes of an underground oil storage tank that was neither known to the Binettes nor obvious, the Binettes may be held to have relied justifiably on the library association's silence in concluding there was no underground oil storage tank on the Deering property, let alone a leaking one, and in buying the property based on that belief.

### Summary Judgment Improper

 The affidavits, depositions, and testimony on the record, viewed in the light most favorable to the Binettes, establish as a matter of law that the Dyer Library Association, in a transaction in which the association had a pecuniary interest, supplied false information. There remain, however, genuine issues of material fact as to whether the library association's breach of its statutory duty was without the exercise of reasonable care or competence and whether the Binettes reliance was justifiable. The court erred in granting a summary judgment to the Dyer Library Association on the Binettes' claim for negligent misrepresentation.

### III

We complete our triad review of the summary judgments entered on the Binettes' claims for negligent misrepresentation by considering the summary judgment entered in favor of Vacationland Realty.

 "A trial court is free to consider company or state regulations among the factors to be weighed in deciding whether a legal duty existed." *Trusiani v. Cumberland & York Distribs., Inc.,* 538 A.2d 258, 262 (Me.1988). Regulations promulgated by the Real Estate Commission of the Department of Professional and Financial Regulation pursuant to 32 M.R.S.A. § 13065 (1988)[3] and in

3. 32 M.R.S.A. § 13065 became effective January 1, 1988. P.L.1987, ch. 395 (see emergency

clause). It was preceded by a series of similar provisions authorizing regulations governing

effect at the time of the July 1988 sale of the Deering property required a licensed listing broker to inform himself of hazardous materials on property for sale, expressly including underground storage tanks, and to convey information pertinent to such hazardous materials in writing to the buyer prior to or during preparation of an offer. Me. Dep't of Professional and Financial Regulations Reg. 330.19 (Feb. 1, 1988).[4]

As with other rules promulgated pursuant to subchapter II of chapter 113 of Title 32, Reg. 330.19 is a judicially enforceable standard of care intended to serve the interests of the public as well as the real estate industry. 32 M.R.S.A. §§ 13065, 13068 (1988). By its own terms Reg. 330.19 is a safety regulation whose purpose is to protect real estate customers.

The relevant real estate regulations create no absolute duty of disclosure for brokers akin to that imposed on property owners by statute. That statute deals only with information that owners of property must give to prospective buyers. If the property owner does not disclose the required information about the existence of the underground storage tank, that omission is a misrepresentation as a matter of law. Beyond this informational requirement, the statute says nothing about how owners of property should conduct themselves in dealing with prospective buyers. The details of the conduct of the owner that led to the misrepresentation are relevant only to the negligence element of the negligent misrepresentation claim.

Although the real estate regulations applicable to a broker also describe information that the broker must impart to the prospective buyer, they do not do so in the absolute terms of the statute. Instead, the regulations create a duty to disclose material defects of which a licensee has knowledge or should have had knowledge given the exercise of reasonable care, and establish the licensee's obligations to inquire of the property owner as to any hazardous materials on or in the real estate, including underground storage tanks, and to convey in writing to the buyer what is learned or the fact that the information is unavailable. Me. Dep't of Prof. and Fin.Reg. 330.14, 330.19 (Feb. 1, 1988).

Thus, the real estate regulations prescribe a process of interaction between the broker, the owner, and the buyer intended to keep buyers informed about hazardous materials that are or might be on the property. In this instance, the jury should decide whether Vacationland Realty and Purvis exercised reasonable care in light of these regulatory requirements. Put most simply, the owners of the property were responsible for the misrepresentation about the presence of the underground oil tank. Arguably, the brokers could have prevented that misrepresentation if they had performed as the regulations require. This is the familiar negligence inquiry, not an inquiry about negligent misrepresentation.

■ We vacate the summary judgment in favor of Vacationland Realty on plaintiffs' claim of negligent misrepresentation and direct the court to allow the plaintiffs to amend

brokerage practices. See, for example, P.L.1977, ch. 694, §§ 623, 625.

**4.** *Me. Dept of Professional and Financial Regulation Reg. 330.19 (Feb. 1, 1988) provided:*
A licensee shall keep himself informed regarding known hazardous materials that may impact negatively upon the health and well being of clients and customers. A listing licensee shall ask the seller whether or not he has any knowledge of current or previously existing known hazardous materials on or in the real estate, including but not limited to:
A. Asbestos;
B. Lead based paint;
C. Radon;
D. Underground storage tanks.

Such information and any other information pertinent to hazardous materials shall be conveyed, in writing, to a buyer prior to or during preparation of an offer. The fact that information regarding hazardous materials is not available shall also be conveyed, in writing, when such is the case. A licensee shall give a written statement to a buyer encouraging that buyer to seek information from professionals regarding any specific issue or concern.
Section 19 was amended in 1991 to extend the disclosure requirement to real estate brokerage licensees who are not the listing agent but who represent the buyer. Me. Dep't of Professional and Financial Reg. 330.19 (Oct. 1, 1991).

their complaint to recast the negligent misrepresentation claims against Vacationland Realty and Purvis as claims of negligence. *See Pelletier v. Mellon Bank,* 485 A.2d 1002, 1004 & n. 6 (Me.1985).[5]

## IV

Finally, we review the summary judgments entered in favor of the Dyer Library Association, Clifford Purvis, and Vacationland Realty on the Binettes' claim for violation of the UTPA.

The UTPA declares "deceptive acts or practices in the conduct of any trade or commerce" unlawful. 5 M.R.S.A. § 207 (1989). The UTPA was amended in 1973 to allow a suit by a private individual who has lost money or property as a result of such an act or practice to enforce liability for the violation of section 207. 5 M.R.S.A. § 213 (1989 & Pamph.1995).

The Binettes argue they deceptively were induced by the defendants' silence regarding the underground oil tank to buy the Deering property and that the defendants' deceptive silence violates the UTPA. Before we may weigh the evidence on the record to determine whether the Binettes have established a *prima facie* case that the library association and its agent committed (1) an unfair or deceptive act or practice (2) in the conduct of trade or commerce, we must construe these statutory terms. It was the express intent of the Legislature that in construing section 207 the courts would be guided by Federal Trade Commission and federal court interpretations of section 5(a)(1) of the Federal Trade Commission Act.[6] 5 M.R.S.A. § 207(1) (1989).

### Unfair or Deceptive Act or Practice

 Whether an act or practice is unfair or deceptive for purposes of section 207

of the UTPA cannot be defined precisely and must be determined by the factfinder on a case by case basis. *Guiggey v. Bombardier,* 615 A.2d 1169, 1172 (Me.1992). The defendants argue that omission by silence cannot constitute an unfair or deceptive act. They also argue that an unknowing failure to disclose a material fact cannot constitute an unfair or deceptive act. We construe the Unfair Trade Practices Act otherwise.

 Although in general the law does not hold one responsible for omitting to disclose what one does not know, we have recognized that the withholding of material information is a type of commercial practice the Federal Trade Commission has determined to be unfair pursuant to 15 U.S.C. § 45(a). We also have held that an act may be deceptive pursuant to section 207 even though the defendant had no purpose to deceive and acted in good faith. *Bartner v. Carter,* 405 A.2d 194, 200 (Me.1979). Good faith does not shield the withholder of material information from liability pursuant to the UTPA.

 As the good faith withholding of known material information may constitute an unfair or deceptive act, so in some cases may the failure to disclose unknown information. An act may be unfair or deceptive even when unknowingly perpetrated. When there is a duty to disclose, unawareness is no shield against UTPA liability. We have stated that although failure to honor a statutory mandate is not a *per se* violation of the UTPA, it may constitute evidence of an unfair or deceptive act. *Inniss v. Methot Buick–Opel, Inc.,* 506 A.2d 212, 216 (Me.1986); *Suminski v. Maine Appliance Warehouse, Inc.,* 602 A.2d 1173, 1174 (Me.1992). We do not restrict this rule to *knowing* failure to comply with a statutory mandate.

---

**5.** While "[o]rdinarily a court will be very reluctant to permit a party against whom summary judgment has been granted to amend to assert a different theory, particularly if no valid reason is shown for his failure to present the new theory prior to action on the summary judgment motion," 2 Field, McKusick & Wroth, *Maine Civil Practice* § 56.1 at 35 (2d ed. 1970), there is no need for reluctance in this case. A traditional negligence claim is not so removed from negligent misrepresentation as a theory of liability

that allowing an amendment of the pleadings would prejudice the defendants. *Cf. Baxter v. Camp Runoia,* 460 A.2d 1373, 1374 (Me.1983) (citing *Soper v. St. Regis Paper Co.,* 341 A.2d 8, 11 (Me.1975) ("there is ample precedent for allowing an obvious amendment rather than granting the motion for summary judgment")).

**6.** 15 U.S.C.A. § 45(a)(1) (1973 & Supp.1996).

■ A failure to disclose, when there is a statutory or regulatory duty to disclose, constitutes evidence of an unfair or deceptive act even when one in actual fact may be unaware of information the statute requires be disclosed.

*Prima facie* evidence on the record establishes that the Dyer Library Association, as seller, was subject to a statutory duty to reveal to the Binettes the existence of the oil tank, and Clifford Purvis as a licensed real estate broker, and the Vacationland Realty partnership as the seller's agent were subject to regulatory duties designed to prevent a non-disclosure. *Prima facie* evidence on the record establishes that each failed to comply with their duties. The evidence of their failure to comply with a regulatory duty is evidence of an unfair or deceptive act. Evidence on the record establishes that information as to the existence of the tank was readily available to the defendants. That their failure to comply with their respective duties was in good faith or unknowing cannot in these circumstances shield them from liability pursuant to section 207.

*In the Conduct of Trade or Commerce*

■ Purvis and Vacationland Realty do not dispute that their participation in the sale of the Deering property was in the conduct of trade or commerce, nor do they dispute that they failed to disclose the existence of the oil tank. Whether their breach of their regulatory duty is an unfair or deceptive practice is a question of fact for consideration of the factfinder.

■ The Dyer Library Association, however, argues that the UTPA does not apply to its sale of the Deering property because any action the library association took in the transaction was not done in the conduct of trade or commerce. The extent of what constitutes "the conduct of trade or commerce" pursuant to the UTPA is a matter of law we review *de novo*.

■ In defining "trade or commerce" the UTPA includes the sale of real property but is silent as to any requirement of an ongoing business context. 5 M.R.S.A. § 206(3) (1989). The Massachusetts Supreme Judicial

Court has construed "the conduct of trade or commerce" pursuant to the Massachusetts unfair trade practices act, which like Maine's tracks the Federal Trade Commission Act, to mean not only a transaction done in the ordinary course of a business or occupation but also an isolated transaction that takes place in a business context, as opposed to one done on a private, nonprofessional basis. *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167, 175–76 (1980). The Massachusetts Court's analysis accords with our own. An isolated transaction in a business context may constitute the "conduct of trade or commerce" for purposes of the UTPA.

■ Factors relevant to whether a transaction took place in a business context include the nature of the transaction, the character of the parties, the activities engaged in by the parties, whether the parties have engaged in similar activities in the past, whether the transaction is motivated by business as opposed to personal reasons, and whether the parties played an active part in the transaction. *See id.*

The Dyer Library Association is a non-profit charitable corporation. It is partially publicly funded. The library association has engaged in the sale of property infrequently but occasionally, when donated property is sold to raise funds for the association's charitable purposes. The association's role in the sale of the Deering property was limited and equivalent to that of a private homeowner listing a residence for sale with a professional real estate agency. No *prima facie* evidence on the record establishes that the Dyer Library Association's sale of the Deering property was in a business context. As a matter of law, therefore, this isolated transaction of the sale by Dyer Library Association to the Binettes does not constitute the conduct of trade or commerce. The trial court did not err in entering a summary judgment in favor of the Dyer Library Association on the Binettes' claim for violation of the UTPA.

The entry is:

Summary judgment in favor of the Dyer Library Association on the claim for violation of the Unfair Trade Practices Act affirmed. Summary judgments in favor of

Clifford Purvis, Dyer Library Association and Vacationland Realty on the claim for negligent misrepresentation and in favor of Clifford Purvis and Vacationland Realty on the claim for violation of the Unfair Trade Practices Act vacated. Remanded for further proceedings consistent with the opinion herein.

All concurring.

