STATE OF MAINE
KENNEBEC, SS.

DISTRICT COURT
WATERVILLE
DOCKET NO. CV-2016-81

JEFFREY STEARNS,
      Plaintiff

V.

**DECISION AND JUDGMENT**

CC & CC, INC, d/b/a
DNK USED CARS,
      Defendant

## INTRODUCTION AND PROCEDURAL BACKGROUND

This matter is before the court for decision following a one-day bench trial held on April 27, 2018. The Plaintiff commenced this action by filing a five-count complaint on July 1, 2016 against the Defendant alleging the following causes of action relating to the sale of a used 2007 Ford F-350 diesel truck: violation of the Unfair Trade Practices Act – 5 M.R.S. §207 et seq. – (Count I); violation of the Uniform Deceptive Trade Practices Act – 10 M.R.S. §§1212 & 1476 – (Count II); Breach of Warranty – 10 M.R.S. §1476 – (Count III); Unjust Enrichment (Count IV), and; Fraud (Count V).

The Defendant filed a timely answer on August 8, 2016, and later moved for summary judgment on April 28, 2017. The Plaintiff filed his response and opposition to summary judgment on July 5, 2017 and at the same time also moved to amend his complaint to add Count VI for Breach of Implied Warranty of Merchantability – 11 M.R.S. §2-314.

In an Order dated October 17, 2017, the court (Stanfill, J.) granted the motion to amend, granted the motion for summary judgment as to Counts II, IV and V

(Uniform Deceptive Trade Practices Act, Unjust Enrichment and Fraud), but denied summary judgment as to Counts I and III (Unfair Trade Practices Act and Breach of Warranty). On February 5, 2018, this case was assigned to the Superior Court for jury-waived trial.

Trial was held on April 27, 2018 at which the court received the testimony of Jeffrey Stearns; Jason Thibodeau (expert witness); Eric Stevens, and; Deborah Collman, all called in the Plaintiff's case-in-chief. Joint Exhibits 1-13 and Plaintiff's Exhibits 1-6 were admitted without objection. The court also received the testimony of Benjamin Palmquist and Jacob Gagne Adams, both of whom were called by the Defendant. Post-trial briefs were received by the court on August 6, 2018.

Based upon the evidence presented at trial, and after consideration of the written arguments of the parties, the court makes the following findings of fact.

## FACTUAL FINDINGS

On or about October 27, 2015, representatives of DNK Used Cars, including Benjamin Palmquist, attended a vehicle auction in Florida at which the Defendant purchased a 2007 White Ford F-350 King Ranch 4x4 Turbo Diesel truck for a total cost of $19,400. (Jt. Ex. 1). Mr. Palmquist examined the vehicle prior to the purchase and also drove the truck after the purchase during the 45 minute "window" before the sale became final. (Trial Transcript, "T.T." at 163-64). Palmquist testified that the vehicle had a "green" and "blue" light designation at the auction, meaning that there were no known mechanical defects and title was not immediately available. (*Id.* at 165).

Palmquist crawled underneath the truck and observed no major issues with the vehicle. He testified that he test drove the truck for approximately 30 minutes, listened to the motor, looked for damage and/or leaks and used a hand scanning tool to plug into the on-board diagnostic system. (*Id.* at 168-69). He concluded that the truck was in "above average condition," that it was very clean, that the underbody

2

was "very good," that there were no leaks or diagnostic codes, that he briefly looked at the universal joint for broken caps, cracks or excessive buildup or corrosion, and found none. He testified that the vehicle would not have qualified for a "green" light designation if it had leaks or engine codes including any injector malfunction. (*Id.* at 170-72).

The truck was transported back to Maine where it arrived at DNK's place of business in Farmingdale no later than November 2, 2015. (Jt. Ex. 2). At that time the truck had mileage on it of 105,148. *Id.* During this time period the Plaintiff, Jeffrey Stearns, was in the market for a "fairly good size truck" that would be suitable for towing his 8400-pound, 30-foot Gulfstream camper. (T.T. at 15, 60). He spoke to Wayne, the sales manager at DNK at the time, who told him that the F-350 should meet his needs. Wayne also told him that the vehicle had to be checked "bumper to bumper" for mechanical defects, "serviced and ready for the road." *Id.* at 16. About a week later the Plaintiff took the truck for a test drive and felt a vibration. He brought this to the attention of the representative of DNK with him on the test drive who surmised that it was "just probably the tires because it's been sitting on the lot awhile." *Id.* at 18. The Plaintiff testified that the DNK employee assured him that the vibration would be checked out, although the testimony at trial was not specific as to where the vibration was coming from prior to the Plaintiff's trip to North Carolina. *Id.* At some point, perhaps after he had purchased the truck, the Plaintiff mentioned the vibration again to DNK and was told again that it was probably the tires and to give it some time. *Id* at 30. There was no evidence presented as to whether anyone at DNK actually inspected the truck for the specific purpose of identifying the source of the vibration, although there was evidence that a "used car check" and a state inspection was performed.

In the meantime, one of DNK's mechanics performed a "used car check" on the truck which included an inspection and possible repair of any "safety items" such

3

the brakes, windows, locks, seatbelts, fluid levels, and whatever was necessary to pass state inspection. (T.T. at 173-74). With respect to this particular vehicle, a service order was generated that shows that the used car check was completed, that windshield washer fluid was added, that a state inspection was performed and that an oil and filter change as done. (Joint Exhibit 2). Total labor was 2.05 hours.[1] *Id.*

The evidence at trial was somewhat incomplete as the question as to which mechanic/technician at DNK actually performed the work on the F-350 truck as reflected in the service order. Nevertheless, the court finds that Jake Gagne Adams performed at least some of the work including the state inspection since his name and signature appear on the sticker. (Plaintiff's Exhibit 6). Mr. Adams, however, had no recollection of ever working on this vehicle. From the court's examination of the trial exhibits, it can infer that Mr. Adams also performed the used car check on this vehicle because the technician number on the service order for the inspection sticker (#208) is the same as that for the used car check. The technician number for the oil and filter change, however, is different (#243). (Joint Exhibit 2). There was no evidence presented at trial as to the significance or meaning, if any, of the different technician #'s identified on the service order, but the court finds that it is at least possible that two different technicians performed the pre-sale work on the Plaintiff's truck.

On or about November 17, 2015, the Plaintiff purchased the truck for a total cost of $27,399, which he paid in cash. (Joint Exhibit 3). The purchase order form signed by the Plaintiff disclosed that the truck was an "out of state title/purch" and there were no "known" mechanical defects or damage. The mileage listed on the

---

[1] During the trial considerable time was spent on the two dates that appear on the service order, namely, November 2 and November 17, 2015. In the final analysis, the court does not find any meaningful significance to those two dates. What seems to be clear is that the inspection sticker was dated, and presumably prepared and affixed to the truck on November 17, 2015. (Plaintiff's Exhibit 6).

4

purchase agreement was 105,171. The Plaintiff was also provided with a "Used Vehicle Buyer's Guide." (Joint Exhibit 4). That form disclosed that there were no known mechanical defects and that "THE VEHICLE WAS ACQUIRED AT AN OUT-OF-STATE AUCTION AND THAT HISTORICAL INFORMATION REGARDING MECHANICAL DEFECTS AND SUBSTANTIAL DAMAGE IS NOT AVAILABLE."

The next paragraph, in bold-face capital letters, stated: **"IMPORTANT: THESE ARE THE ONLY PROBLEMS KNOWN TO THE DEALER. ASK IF YOU MAY GET AN INDEPENDENT INSPECTION BEFORE PURCHASE."** There was no evidence presented at trial that the Plaintiff asked to have an independent inspection performed. As required by state law, the "Warranty of Inspectability" box was checked. The next box was also checked and stated: **"NO EXPRESS WARRANTY EXCEPT THAT VEHICLE MEETS STATE INSPECTION STANDARDS."** Immediately below the waiver of any express warranties the following explanatory language appears: "You will pay for all costs for any repairs not related to meeting state inspection standards, regardless of any oral statements about the vehicle. The dealer accepts no responsibility for repairs except those necessary to pass state inspection." (Joint Exhibit 4).

The Warranty of Inspectability covered "MAINE STATE INSPECTION ITEMS ONLY," for a period of 30 days or 1000 miles "WHICHEVER OCCURS FIRST." The paragraph pertaining to "Implied Warranties" was marked "XX NO."[2] The Plaintiff's signature appears on this form and at trial he acknowledged signing it. T.T. at 54. At the time of purchase, the Plaintiff expressly declined to purchase the extended warranty and GAP coverage that was offered to him, and explained his

---

[2] The "Guide" also alerted the Plaintiff that a service contract "is available at an extra charge" and if purchased within 90 days of the sale, the Maine "implied warranties" could not be limited.

reasoning at trial as follows: "Why would I when a diesel is good for 300,000 miles?"[3] (T.T. at 56; Joint Exhibit 5). Benjamin Palmquist testified that the estimated cost of the extended warranty coverage was approximately $2,995. (T.T. at 183).

Within a matter of days, while the truck was parked in a hotel parking lot in Waterville, a fairly substantial leak was discovered. It was described at trial as having a somewhat watery consistency, suggesting that it might have been a combination of oil and coolant. (T.T. at 20, 155). The Plaintiff took the truck back to DNK and was told that the problem was an oil plug gasket that needed to be replaced. According to both the Plaintiff and Ms. Collman, the truck was taken back to the garage and returned within 5 minutes.

What actually took place in the DNK garage on this occasion was a major point of contention at the trial. Based on the evidence presented, however, the court was and is left with more questions than answers regarding this incident. No service order or other documentation was created with respect to this event and the Plaintiff was not charged anything for the service. The Plaintiff and Ms. Collman were suspicious with the explanation given to them because they felt that it should have taken longer to resolve the problem with the leak, particularly if the oil had to be drained and replaced.

Benjamin Palmquist, a post-sale/pre-sale inspection specialist with DNK and who was described by Jacob ("Jake") Gagne Adams as a "jack-of-all-trades" mechanic, (T.T. at 222), testified that he was in the DNK garage when the Plaintiff's truck was brought in due to an oil leak complaint. He said that he saw the mechanic

---

[3] There can be no doubt that the Plaintiff understood that the Warranty of Inspectability only covered those items that were necessary for the vehicle to pass state inspection as he was told before he purchased the truck that DNK would not replace the front hub seals because they were not an inspectable item. (T.T. at 57).

remove the old oil plug and install a new one "as fast as he could" and that the mechanic "got quite a bit of oil on himself." (T.T. at 185-86). Mr. Palmquist testified that the loss of oil amounted to approximately 1 ½ quarts, that the oil was "topped off," and that the process took 5-10 minutes. (T.T. at 186). On cross-examination, Palmquist testified that he believed the mechanic who performed this service/operation on the F-350 truck was Jake Gagne Adams. (T.T. at 200).

It was not anticipated that Mr. Adams would be called as a witness at this trial. He was contacted at the DNK garage at the end of Mr. Palmquist's testimony and directed to come to court to testify. He ended up being called in the defense case. The court found Mr. Adams to be a credible witness. Mr. Adams testified that he has never removed an oil seal plug and replaced it with a new one while the oil was actively draining. (T.T. at 221-222). Based on the testimony of Mr. Adams the court finds that he did not remove the oil plug and replace it with a new one on the Plaintiff's truck as suggested by Mr. Palmquist. Whether such an operation was performed by some other mechanic at DNK is unknown. Indeed, there is insufficient evidence as to what actually was done to the Plaintiff's truck on that occasion as far as the court is concerned.

What the evidence does show, and the court so finds, is that the leak (whatever its cause) was apparently resolved. The Plaintiff has suggested that someone at DNK introduced a product known as "stop-leak" into the coolant because when the technician at Ray Haskell Ford replaced the engine in the vehicle "stop-leak" was discovered in the thermostat.[4] (T.T. at 110). Mr. Palmquist, however, testified that DNK does not have "stop-leak" in its garage. (T.T. at 212). Mr. Adams was not asked any questions about that subject. Finally, Jason Thibodeau, the expert

---

[4] The Plaintiff testified that he was "speculating" that DNK put the "stop-leak" in the truck based upon the fact that his truck was serviced and the leak stopped within 5 minutes. (T.T. at 29-30).

mechanic called by the Plaintiff, acknowledged that there was no way to know how or when or by whom the "stop-leak" was used on this vehicle, and that if it had been introduced into the vehicle prior to DNK's purchase of it, DNK would have had no reason to be aware of it. (T.T. at 110).

The court finds that whatever service was actually performed on the Plaintiff's truck after it was brought in for the "leak" issue within a few days of purchase, was not causally related to the engine failure that occurred in December, 2015 as the Plaintiff was driving back to Maine from North Carolina.[5]

A few days later, while the Plaintiff was driving the truck, the "check engine" light came on. (T.T. at 25). Once again, the Plaintiff returned it to DNK where it was discovered that the code for the "check engine" light was because the truck was equipped with an EGR delete kit. (T.T. at 25; Joint Exhibit 12). This device, presumably installed by the previous owner of the vehicle, affects the truck's compliance with federal emissions standards. While the presence of such a device on the truck would make it fail inspection in Cumberland County (because of additional standards in that county), it would not affect its inspectability in Kennebec County, nor would it fail state inspection standards. (T.T. at 112). *See* 29-A M.R.S. §1751(1) & (2-A). The "check engine" light was reset at DNK and the Plaintiff was told to expect that it would likely come on again. (T.T. 27).

After the incident with the "check engine" light the Plaintiff, accompanied by Ms. Collman, drove the truck and the 8400-pound camper to North Carolina to visit his two sons. On the way down, the vibration in the rear of the vehicle became so severe that "the rear end of the truck was jumping right up and down." (T.T. at 33). The Plaintiff brought the vehicle to Lafayette Ford in Fayetteville, North Carolina.

---

[5] The court also notes that Mr. Thibodeau testified that a certain amount of oil leakage is common in trucks of the size of the Plaintiff's F-350. (T.T. at 108-09).

(*See* Joint Exhibits 6, 7 & 8). The dealer determined that the rear universal joint (U-joint) was inoperable and required replacement. A windshield wiper needed to be replaced as well. The Plaintiff paid $470.76 for these repairs. The dealer also recommended additional service on the rear hub seal and O-ring and the front differential hub seal seals and dust seal, which the Plaintiff declined. The date of the service at Lafayette Ford was December 16, 2015 and the mileage on the truck was 108,437, meaning that the Plaintiff had driven the vehicle a total of 3,266 miles since the time of purchase.

The service technician at Lafayette Ford performed a multi-point inspection of the truck. It was checked for oil and fluid leaks and none were observed. The inspection report did not make any reference to the "check engine" light being on. The court does not recall any testimony from the Plaintiff that he noted the "check engine light" coming on during his drive down to North Carolina. With respect to fluids, the inspection report indicated that it "may require future attention" but did not otherwise elaborate.

After completing the repairs at the dealership in Fayetteville, the Plaintiff and Ms. Collman began the ride back to Maine in order to be back home for a medical appointment and for Christmas. By the time they reached New York City the Plaintiff noticed that the truck had a slight "skip" or hesitation to it and was "blowing a little smoke." (T.T. at 42). Between N.Y.C. and Maine the skipping became more pronounced and the truck was "blowing more black smoke." Upon reaching Gardiner the truck "blew so much smoke that you couldn't even see the guy in the toll booth." (*Id* at 43). A mile later, "she died completely." *Id.*

The Plaintiff called Wayne at DNK and told him that he had blown the motor on the truck and asked if DNK could help. According to the Plaintiff, Wayne said: "There is nothing we can do." (T.T. at 44). The vehicle was inoperable and was eventually towed to Ray Haskell Ford in Waterville, arriving there on December 20,

9

2015 with a mileage reading of 109,443, having been driven 4,272 miles since its purchase by the Plaintiff. (Joint Exhibit 10). The vehicle would not leave Ray Haskell Ford until January 11, 2016, at which time the Plaintiff paid $21,729.29 for a new engine and other related repairs. Initially, it was thought that replacing the fuel injectors would solve the problem, but that turned out not to be the case. The invoice from Ray Haskell Ford explained what was done to repair the truck:

> Replaced all injectors. Tested. Cylinder 5 misfire still present, injector code gone. Ran relative compression test, cylinder 5 very low at 3 lbs. Customer authorized pulling head and diagnosing further. Removed head found heat damage to head, exhaust valve, piston and plug in cylinder five. Found evidence of head gasket leaking as well in cylinders 3, 5 and 7. Due to excessive damage recommend complete engine replacement. Note, found partial delete kit, EGR cooler was removed and replaced with coolant bypass prior to arriving at dealership. Turbo bolts were loose. Upon removal of bad engine also found stop leak in cooling system. Removed and replaced complete engine assembly, flushed coolers, heater core, radiator and CAC. Test drove. Concern resolved.

Jason Thibodeau was the senior master Ford technician who worked on the Plaintiff's truck while it was at Ray Haskell Ford. It was his opinion that one of the injectors was "hanging open" causing "unregulated amounts of fuel" to be "dumped" into the cylinder resulting in much hotter combustion thereby causing damage to the engine, including a melted piston. (T.T. at 84-85). Mr. Thibodeau opined at trial that he believed that this was the result of the quality of the oil, but he acknowledged that at his deposition he had testified that the problem was related to an electrical fault inside the engine and he confirmed at trial that was still a possibility. (T.T. at 101).

The court found Mr. Thibodeau to be a generally credible witness. The one area, however, in which the court found his testimony to be somewhat problematic was in how much weight or reliance should be given to his opinions as to what DNK

10

should have known or been aware of when it had possession of the vehicle a little over 4200 miles and about one month earlier.

For example, Mr. Thibodeau was dubious that an oil change had actually been performed by DNK as indicated in Joint Exhibit 2, roughly 4200 miles prior to the engine in the truck suffering a catastrophic failure. (T.T. at 89-90). He based this on the consistency of the oil he observed after the engine failure. In particular, he emphasized that the oil he saw was darker and thicker than he would have anticipated at 3000-4000 miles. He explained that the oil he saw was more consistent with oil at 10,000 to 12,000 miles. Unlike Mr. Adams, however, Mr. Thibodeau did not provide any explanation of how oil in a turbo diesel vehicle differs from oil in a regular gas engine. (T.T. at 240-41).

As another example, Mr. Thibodeau testified about oil from the truck leaking down the rear of the engine block over a long period of time which should have been seen by DNK. (T.T. at 87-89, 93-94). The truck, however, was inspected for oil leaks by Lafayette Ford just days before the engine failure and none were noted on the multipoint inspection report. (Joint Exhibit 6). Moreover, Mr. Thibodeau testified that it would not be surprising to have oil leaks in a truck of this size and such leakage would have to reach a certain threshold level before it would cause the truck to fail state inspection standards. (T.T. at 108-09).

With respect to the u-joint, Mr. Thibodeau theorized that there was a problem with it when it left DNK's lot (T.T. at 116), but he also acknowledged that the wear and tear on a u-joint is a gradual process and he could not say what the condition of the u-joint was when the truck was still in DNK's possession. (T.T. at 120). Ultimately, the technician performing the used car check and the state inspection must use discretion in deciding whether the wear and tear has become excessive. (T.T. at 120).

11

Regarding the misfiring injector, Mr. Thibodeau testified that if there was no misfiring at DNK he would not expect DNK to recognize the problem. Similarly, if there had been misfiring while the truck was at Lafayette Ford, he would expect that it would have been revealed on the multipoint inspection. (T.T. at 102-03).

Finally, Mr. Thibodeau recognized that the Plaintiff's vehicle could have passed inspection and then broke down 30 days later because passing state inspection standards is "not a guarantee." (T.T. at 113).

Thus, while the court found Mr. Thibodeau to be a knowledgeable and skilled master service technician, his opinions were based on his work on the truck after it had experienced a catastrophic engine failure. As a result, he had the benefit of being able to dismantle the engine and make observations that neither DNK nor Lafayette Ford were able to make. For that reason, the court has closely analyzed the totality of the evidence to determine whether the Plaintiff has met his burden of proof as to his remaining causes of action. The remaining counts before the court for decisions are Counts I, III and VI. The court will address each cause of action in turn.

## DISCUSSION

### Count I – Unfair Trade Practices Act (UPTA)

Title 5 M.R.S §207 declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Section 213 authorizes a private cause of action by anyone who purchases goods "primarily for personal, family or household purposes and thereby suffers any loss of money or property . . . as a result of the use or employment by another person of a method, act or practice declared unlawful by section 207." The statute allows for the award of actual damages as well as attorney's fees and costs.[6]

---

[6] The Defendant has argued that, at the very least, the Plaintiff is not entitled to any award of attorney's fees because he failed to comply with the written demand for relief

Whether a trade practice is unfair or deceptive is a question of fact. *Binette v. Dyer Library Ass'n.* 688 A.2d 898, 906 (Me. 1996). As the Law Court has pointed out on more than one occasion, "[t]he UPTA does not contain a definition of either the term 'unfair' or 'deceptive.'" *State v. Weinschenk*, 2005 ME 28, ¶ 15, 868 A.2d 200; *State v. Shattuck*, 2000 ME 38, ¶ 13, 747 A.2d 174. Rather, whether an act or practice is unfair or deceptive in violation of UPTA "must be made by the fact-finder on a case-by-case basis." *Id.*

An *unfair* act or practice "(1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers, and; (3) that is not outweighed by any countervailing benefits to consumers or competition." *Weinschenk*, 2005 ME 28, ¶ 16. A *deceptive* act or practice "is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Id.* at ¶ 17. *See also Benner v. Wells Fargo Bank, N.A.*, 2018 U.S. Dist. LEXIS 52716 *36, n.16 (March 29, 2018) (Torresen, C.J.). A material representation, omission, act or practice "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164 (1984). Finally, an act or practice may still be deceptive notwithstanding a defendant's good faith or lack of intent to deceive. *Binette*, 688 A.2d at 906.

The court finds that the Plaintiff has failed to show by a preponderance of the evidence that the Defendant employed any unfair or deceptive act or practice within the meaning of the UPTA in connection with the sale of the F-350 Ford truck. The Plaintiff has argued that the truck was "breaking down" shortly after it was purchased and that the Defendant knew or should have known of the various defects with the vehicle.

---

as required by 5 M.R.S. §213(1-A). In light of the court's ultimate decision under Count I of the amended complaint, it is not necessary to address this issue.

13

The Plaintiff's argument, however, ignores the fact that the Defendant did not represent that the truck was free of all defects, nor did it represent that it was aware of all potential defects in the vehicle. Indeed, the Defendant made it clear to the Plaintiff that the truck he was buying had been acquired by DNK at an out of state auction and historical information about the vehicle was not available.

The Plaintiff has argued that his expert opined that the oil leakage had been on-going for a long period of time and, therefore, DNK should have been aware of it if it had done a competent inspection of the vehicle. This testimony, however, must be balanced against the fact that Mr. Thibodeau himself testified that oil leaks in trucks like this one are common and do not necessarily mean that the truck would fail inspection standards. Moreover, Lafayette Ford did not make note of any leaks when it inspected the truck on December 16, 2015, just a few days before the engine in the truck failed.

The court is not persuaded by the suggestion that DNK, in essence, created a fictitious service order documenting that it changed the oil and filter when, in fact, it did not.

The warranty that the Plaintiff received was limited to the warranty of inspectability as required by 10 M.R.S. §1474, in chapter 217. A violation of that chapter "shall constitute a violation of Title 5, chapter 10, Unfair Trade Practices Act." 10 M.R.S. §1477(1). The court finds that the Plaintiff has not demonstrated by a preponderance of the evidence that the Defendant violated the warranty of inspectability. The fact that there were issues with the truck, including a leak and a non-specific vibration, does not prove that the vehicle did not meet state inspection standards at the time it was purchased by the Plaintiff and for the first 1000 miles. This is true as it applies to the windshield wiper replacement and the u-joint replacement that became necessary when the truck was taken to Lafayette Ford. The Maine Motor Vehicle Inspection Manual requires that a vehicle should be rejected

for an inspection sticker if any wiper blade is "worn." Similarly, a vehicle should be rejected if the universal joints show "excessive wear or play." *See Classes A & E Motor Vehicle Inspection Standards*, 16-222 Chapter 1, Section 170 (8) (A) (3) (Windshield Wipers) and (10) (G) (13) (Springs, Torsion Bar, Shocks, Bushings and Axles). In both instances, the technician performing the inspection must make a judgment call as to whether the item in question is excessively worn. As the Plaintiff's expert stated, an inspection sticker is not a guarantee that the truck will not break down 30 days later. In short, the evidence before the court falls short of showing, more likely than not, that the Defendant engaged in unfair or deceptive acts or practices in connection with its sale of the F-350 truck to the Plaintiff.

### Count III – Breach of Warranty of Inspectability – 10 M.R.S. §1474

Title 10 M.R.S. §1474(1) mandates that a dealer of used motor vehicles, as defined in section 1471(2), warrants that the vehicle was inspected in accordance with 29-A M.R.S. §1751, and any rules promulgated pursuant thereto and that the vehicle meets those inspection standards. The warranty of inspectability may not be excluded, limited, modified or waived. 10 M.R.S. §1474(2).

For the reasons already stated, the court finds that the Plaintiff has not satisfied his burden of proving by a preponderance of the evidence that the Defendant failed to perform its obligations under the warranty of inspectability as required by 10 M.R.S. §§1474(1) & 1476(1).[7]

---

[7] The Defendant further argues that the Plaintiff is precluded from bringing an action under 10 M.R.S. §1476 because he failed to comply with the written notice as required by section 1476(3)(B). Because the court has found that the Plaintiff has not met its burden of proof on the merits of this cause of action there is no need to address this issue.

### Count VI – Breach of Express and Implied Warranties of Merchantability

In Count VI of his amended complaint, the Plaintiff has asserted a cause of action based on express warranties under 11 M.R.S. §2-313 and the implied warranty of merchantability under 11 M.R.S. §2-314.

In the court's view, the Plaintiff has not presented sufficient evidence to establish that any express warranty was made or violated by the Defendant. The evidence from the Plaintiff at trial supported the view that he was looking for a good-sized truck capable of towing his 8400-pound Gulfstream camper. At most, the Plaintiff showed that the salesman pointed him towards the F-350 truck, which would be a suitable "good-sized" truck for towing such a camper. Beyond that, however, the Plaintiff has not established any express warranty with respect to the mechanical condition of the truck. On the contrary, the evidence was clear that no express warranties were given except the warranty of inspectability. (Joint Exhibit 4).

With respect to the implied warranty of merchantability, this was expressly excluded. (Joint Exhibit 4). DNK was within its rights to exclude the implied warranty of merchantability. 11 M.R.S. §2-316(5) and 10 M.R.S. §1473.

Finally, the court is not persuaded that the Plaintiff "froze" his rights under the warranty of inspectability by returning the truck to DNK after the oil leak was discovered and the "check engine" light came on. The leakage stopped and was not noticed again, even after the truck was driven to North Carolina and inspected by Lafayette Ford. The existence of the EGR delete kit was not prohibited by state inspection standards applicable to Kennebec County. The non-specific vibration the Plaintiff noticed in his test drive of the truck may (or may not) have been related to the ultimate failure of the u-joint 3200 miles later on the trip to North Carolina. Nevertheless, there was insufficient evidence that the vehicle did not meet inspection

16

standards at the time it was sold to the Plaintiff and within the first 1000 miles of use.

In the final analysis, the Plaintiff purchased a used vehicle which he knew had been obtained at an out of state auction. He did not seek to have the truck examined or inspected by an independent mechanic/technician. He expressly declined to purchase extended warranty coverage on the vehicle and chose to accept the limited warranty of inspectability, having been informed that he would "pay all costs for any repairs not related to meeting state inspection standards." (Joint Exhibit 4).

The court is left with a lack of persuasive evidence to conclude, by a preponderance of the evidence, that the Defendant breached the only warranty it gave to the Plaintiff, and is left to the realm of speculation. That is simply not enough to satisfy the Plaintiff's burden of proof.

## CONCLUSION

For the foregoing reasons, the entry is:

Judgment for the Defendant on Counts I, III and VI of the Plaintiff's Amended Complaint.

The Clerk is directed to incorporate this Decision and Judgment into the docket of this case by notation reference in accordance with M.R.Civ.P. 79(a).

Dated: September 19, 2018

William R. Stokes
Justice, Superior Court

Entered on the docket 9/21/18

17

JEFFREY STEARNS - PLAINTIFF
C/O CHARLES T FERRIS ESQ 11 PARK STREET
WATERVILLE ME 04901
Attorney for: JEFFREY STEARNS
CHARLES FERRIS - RETAINED
FERRIS GURNEY AND CROOK PC
11 PARK STREET
WATERVILLE ME 04901

DISTRICT COURT
WATERVILLE
Docket No   WATDC-CV-2016-00081

**DOCKET RECORD**

vs
CC AND CC INC DBA DNK USED CARS - DEFENDANT
CHARLES F CLARK, CORP CLERK, 530 MAINE AVENUE
FARMINGDALE ME 04344
Attorney for: CC AND CC INC DBA DNK USED CARS
MATTHEW S WARNER - RETAINED
PRETI FLAHERTY BELIVEAU PACHIOS LLP
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

Filing Document: COMPLAINT                 Minor Case Type: CONTRACT
Filing Date: 07/01/2016

## Docket Events:

07/01/2016 FILING DOCUMENT - COMPLAINT FILED ON 07/01/2016

07/05/2016 Party(s):  JEFFREY STEARNS
           ATTORNEY - RETAINED ENTERED ON 07/01/2016
           Plaintiff's Attorney: CHARLES FERRIS

07/05/2016 Party(s):  CC AND CC INC DBA DNK USED CARS
           SUMMONS/SERVICE - PROOF OF SERVICE SERVED ON 06/23/2016

08/17/2016 Party(s):  CC AND CC INC DBA DNK USED CARS
           ATTORNEY - RETAINED ENTERED ON 07/21/2016
           Defendant's Attorney: MATTHEW S WARNER

08/17/2016 Party(s):  CC AND CC INC DBA DNK USED CARS
           MOTION - MOTION FOR ENLARGEMENT OF TIME FILED ON 07/21/2016
           Defendant's Attorney: MATTHEW S WARNER
           TO FILE ANSWER

08/17/2016 Party(s):  CC AND CC INC DBA DNK USED CARS
           RESPONSIVE PLEADING - ANSWER FILED ON 08/08/2016
           Defendant's Attorney: MATTHEW S WARNER

08/19/2016 Party(s):  CC AND CC INC DBA DNK USED CARS
           MOTION - MOTION FOR ENLARGEMENT OF TIME GRANTED ON 08/17/2016
           VALERIE  STANFILL , JUDGE

08/19/2016 ORDER - COURT ORDER ENTERED ON 08/17/2016
           VALERIE  STANFILL , JUDGE
           DEFENDANT'S DEADLINE TO ANSWER THE COMPLAINT TO BE EXTENDED UNTI AUGUST 8, 2016. COPY ATTY
           FERRIS AND ATTY WARNER